# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
NATIONAL ASSOCIATION OF HOME        )
BUILDERS                            )
                                    )
    Plaintiff,               )
                                    )
      v.                 )    Civ. No. 1:07-cv-00972 (RMU)
                                    )
UNITED STATES ARMY CORPS OF         )
ENGINEERS, et al.                   )
                                    )
    Defendants.              )
_____)

## DEFENDANTS' MOTION FOR JUDGEMENT ON THE PLEADINGS

    Defendants United States Army Corps of Engineers, Preston M. Geren, III, in his official capacity as the Acting Secretary of the United States Department of the Army, and Lt. Gen. Robert L. Van Antwerp, in his official capacity as the Chief of Engineers for the United States Army Corps of Engineers (collectively "the Corps") hereby move, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(c), to dismiss the Complaint for lack of jurisdiction.  Dismissal is warranted because Plaintiff lacks standing under Article III of the Constitution.

## INTRODUCTION

    Plaintiff National Association of Home Builders ("NAHB") lacks standing to challenge the Corps' issuance of Nationwide Permit ("NWP") 46 because Plaintiff cannot demonstrate a sufficient causal nexus between NWP 46 and any alleged injury.  NAHB's Complaint baldly asserts that it is injured by the Corps' allegedly unlawful assertion of regulatory jurisdiction over ditches addressed by NWP 46.  Even if such a generalized grievance is sufficient to constitute a cognizable injury for purposes of Article III standing, NAHB could not establish standing because it cannot show a link between the challenged conduct – NWP 46 – and the alleged injury

– the alleged unlawful exercise of regulatory jurisdiction over covered ditches. NWP 46 does not purport to exercise jurisdiction over any ditches; by its plain terms, it defers any determination of the jurisdictional status of potentially covered ditches to a case-by-case determination, consistent with the Corps' longstanding interpretation of its regulations. All NWP 46 does is provide that those wishing to discharge into certain ditches that are determined to be jurisdictional waters of the United States may do so without obtaining an individual permit. Because NWP 46 does not change the jurisdictional status of any ditches, NWP 46 cannot have caused NAHB any injury. This lack of causation is fatal to NAHB's standing to bring this action. Accordingly, this Court lacks jurisdiction and NAHB's Complaint should be dismissed.

## BACKGROUND

### A.    The Clean Water Act and Nationwide Permits

Congress enacted the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Id. § 1251(a). Section 301(a) of the CWA prohibits the discharge of any pollutant by any person," except in compliance with the CWA. Id. § 1311(a). The term "discharge of a pollutant" is defined to mean "any addition of any pollutant to navigable waters from any point source." Id. § 1362(12)(A). The CWA defines "navigable waters" to mean "the waters of the United States, including the territorial seas." Id. § 1362(7).

The Corps and the Environmental Protection Agency ("EPA") share responsibility for implementing and enforcing CWA Section 404, id. § 1344, which authorizes the issuance of permits for the discharge of dredged or fill material into waters covered by the CWA. See, e.g., id. 1344(a)-(c). The Corps and EPA have promulgated substantively equivalent regulatory

definitions of the term "waters of the United States." See 33 C.F.R. § 328.3(a) (Corps definition); 40 C.F.R. § 230.3(s) (EPA definition). Those definitions encompass, inter alia, traditional navigable waters, tributaries of traditional navigable waters, and adjacent wetlands within the scope of waters of the United States that are subject to CWA regulation. See 33 C.F.R. § 328.3(a); 40 C.F.R. § 230.3(s). When requested, the Corps can make a jurisdictional determination to decide whether a putative "water of the United States" is within its CWA regulatory jurisdiction and thus whether a permit is necessary. 33 C.F.R. §§ 320.1(a)(6), 325.9. The Corps' regulations include an administrative appeal process for jurisdictional determinations and for permit denials and declined permits. See 33 C.F.R. pt. 331.

The Corps issues two general types of permits under Section 404. First, section 404(a) authorizes the Corps to issue individual permits on a case-by-case basis. 33 U.S.C. § 1344(a). Individual permits are issued after a resource-intensive case-by-case review, involving, among other things, extensive site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. See 33 C.F.R. § 322.3 (specifying activities requiring permits); 33 C.F.R. pts. 323, 325 (policies and procedures to be followed in issuing permits).

Second, of relevance here, CWA Section 404(e) authorizes the Corps to issue general permits on a state, regional or nationwide basis, in lieu of individual permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 322.2(f)(1). The Corps' regulations provide

3

that the "general permit program . . . is the primary method of eliminating unnecessary federal control over activities which do not justify individual control or which are adequately regulated by another agency." 33 C.F.R. § 320.1(a)(3). Nationwide general permits are a type of general permit "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." Id. § 330.1(b).

When determining whether to issue a nationwide permit, the Corps must conduct an evaluation pursuant to the CWA Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230, issued by EPA. 33 U.S.C. § 1344(e)(1). A nationwide permit complies with the Guidelines if the Corps determines that (1) the activities "are similar in nature and similar in their impact upon water quality and the aquatic environment," and (2) the activities will have "only minimal adverse effects when performed separately" and "only minimal cumulative adverse effects on water quality and the aquatic environment." 40 C.F.R. § 230.7(a). In addition, general permits may not be issued for more than five years, and the Corps retains the authority to revoke or modify general permits if they have more than minimal adverse impacts on the environment, or the Corps determines that the activities authorized are more appropriately regulated through the individual permit program. 33 U.S.C. § 1344(e)(2).

The Corps has issued nationwide general permits (simply referred to as "nationwide permits") since 1977 and every five years thereafter. On March 12, 2007, the Corps issued or reissued a total of 49 nationwide permits covering various categories of activities, including the nationwide permit at issue here, NWP 46. 72 Fed. Reg. 11,092 (Mar. 12, 2007) (attached as "Ex. A"). Each NWP is issued subject to numerous specific and general conditions. Failure to fully

comply with the terms and conditions of the nationwide permit prior to undertaking filling activities could subject the party to enforcement action.  33 C.F.R. § 330.1(c).

## B.     NWP 46 Terms and Conditions

Here, Plaintiff challenges NWP 46, which authorizes discharges of dredged or fill material into certain types of ditches.  72 Fed. Reg. at 11,190 (Ex. A).[1]  Specifically, NWP 46 applies to non-tidal ditches that: (1) are constructed in uplands; (2) receive water from another water of the United States; (3) divert water to another water of the United States; and (4) are determined to be a water of the United States.  Id.  In order to fall within the scope of NWP 46, the ditch must meet all four specified criteria.  Id.

In addition, the terms and conditions of NWP 46 limit its use in several ways.  Any discharge pursuant to NWP 46 must not cause the loss of greater than one acre of waters of the United States.  Id.  Use of NWP 46 is further restricted in that it does not authorize discharges into ditches constructed in streams or other waters of the United States, or streams that have been relocated to uplands or discharges that increase the capacity of the ditch and drain areas determined to be waters of the United States prior to construction of the ditch.  Id.

The terms of NWP 46 further require that prospective permittees provide the Corps with pre-construction notification or "PCN" for their project.  Id. at 11,190.  The Corps added this PCN requirement to "ensure that this NWP is used only to authorize discharges into those types of ditches [that meet the specified criteria], and to ensure that those activities result in minimal adverse effects on the aquatic environment."  Id. at 11,142.

---

[1] Although the proposed version of NWP 46 would have applied to certain "ditches and canals," the final version of NWP 46 did not contain a reference to canals.  Compare 71 Fed. Reg. 56,258, 56,274 (Sept. 26, 2006) (attached as "Ex. B"), with 72 Fed. Reg. at 11,142 (Ex. A).

5

General Condition 27 establishes procedures by which prospective permittees must satisfy the PCN requirement.  See id. at 11,194.  Prospective permittees must notify the district engineer, in writing, and must provide general information as well as information specific to the NWP invoked.  Id.  Among other things, the PCN must include the location of the project; a brief description of the project; the project's purpose; direct and indirect adverse environmental impacts the project would cause; and a list of any other NWP's regional general permit(s) or individual permit(s) intended to be used.  Id.

Upon receipt, the Corps will review the PCN to confirm that the project meets the conditions of the respective NWP's.  Prospective permittees may not commence work pursuant to NWP 46 until notified by the Corps that the activity may proceed, unless 45 days have passed from the Corps' receipt of the notice and the prospective permittee has not received notice from the Corps.  Id.  In response to a PCN, the Corps may notify a prospective permittee that an individual permit is required.  Id.  In the case of NWP 46, the Corps also may determine that the ditch is not a jurisdictional water of the United States and therefore no Corps authorization to proceed – under either a NWP or an individual permit – is necessary.  See id. at 11,143.

## C.    Plaintiff's Complaint

NAHB filed its Complaint for Declaratory and Injunctive Relief on May 24, 2007, and its corrected Complaint on July 16, 2007.  NAHB's Complaint does not challenge the effect of the terms and conditions of NWP 46.  Rather, NAHB challenges NWP 46 "because it purports to exercise jurisdiction over upland ditches," features which it alleges are outside of the Corps' permitting authority.  See Compl. ¶ 2.  However, NAHB's Complaint fails to identify anything in the Corps' preamble or the terms of NWP 46, itself, that addresses the jurisdictional status of

ditches.  As NAHB acknowledged, the Corps stated in the preamble that it "reserves the right on

a case-by-case basis to determine whether non-tidal ditches excavated on dry land . . . constitute

waters of the United States."  Compl. ¶ 25 (quoting 72 Fed. Reg. at 11,143); see also 72 Fed.

Reg. at 11,143 (Ex. A).  NWP 46 authorizes discharges into only those ditches that "are

determined to be waters of the United States" and meet certain other criteria.  72 Fed. Reg. at

11,190 (Ex. A).  Thus, NWP 46 expressly defers any determination whether a particular ditch is a

"water of the United States" within the Corps' regulatory jurisdiction.

## STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[a]fter

the pleadings are closed but within such time as not to delay the trial, any party may move for

judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Where a Rule 12(c) motion is based upon the

lack of subject matter jurisdiction, the motion "merely serve[s] as an auxiliary device that enables

a party to assert [these] procedural defenses after the close of the pleadings."  5C Charles A.

Wright & Arthur R. Miller, Federal Practice and Procedure § 1367, at 516 (1990).  In such

circumstances, the standard for judgment on the pleadings is the same as for a motion to dismiss

pursuant to Rule 12(b)(1).  Id.

A motion to dismiss for lack of subject matter jurisdiction must be granted if the court

lacks the statutory authority to hear and decide the dispute.  Fed. R. Civ. P. 12(b)(1).  Because

federal courts are courts of limited jurisdiction and may hear cases only to the extent expressly

provided for by statute, the first and fundamental question presented by every case brought to a

federal court is whether the court has jurisdiction to hear it.  Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, 94-95 (1998) ("jurisdiction [must] be established as a threshold matter").

The Supreme Court has made clear that "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).

In deciding a Rule 12(b)(1) motion, the court is not limited to the allegations in the complaint but may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case. Bates v. Rumsfeld, 271 F. Supp. 2d 54, 60 (D.D.C. 2002). "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir.1992). While the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. See Primax Recoveries, Inc. v. Lee, 260 F. Supp. 2d 43, 47 (D.D.C. 2003). Indeed, in deciding a 12(b)(1) motion, plaintiff's factual allegations in the complaint will bear closer scrutiny than in resolving a 12(b)(6) motion for failure to state a claim. Bates, 271 F. Supp. 2d at 59-60.

## ARGUMENT

### PLAINTIFFS LACK STANDING UNDER ARTICLE III OF THE CONSTITUTION

Article III of the Constitution allows federal courts to decide only "actual cases or controversies," and "[t]he concept of standing is part of this limitation." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976); see also Citizens for a Better Env't, 523 U.S. at 102 ( "Standing to sue is part of the common understanding of what it takes to make a justiciable

case."). Thus, "a showing of standing is an essential and unchanging predicate to any exercise of [this Court's] jurisdiction." <u>Florida Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (internal quotation marks and citation omitted). Accordingly, to pursue their claims in federal court, NAHB must, as a threshold matter, satisfy the requirements for Article III standing.

To meet the Article III requirements for standing, NAHB must demonstrate that: (1) it or one of its members has suffered an "injury in fact" that is actual and imminent, not conjectural or hypothetical; (2) there is a causal connection between injury complained of and the challenged action of the Corps; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. <u>See Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). Plaintiff bears the burden to demonstrate affirmatively and clearly that they possess sufficient standing to seek the requested relief. <u>See FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 231 (1990).

This case turns on the second element in the standing inquiry – causation. As the D.C. Circuit recently observed, the "causation requirement concerns the link 'between the injury and the conduct complained of'; the second is some legal wrongdoing (a bullet fired with ill intent, an investor tricked) and the first its alleged result (a loss of life or property)." <u>Transp. Workers Union of Am. v. Transp. Sec. Admin.</u>, --- F.3d ---, No. 05-1225, 2007 WL 1892087, at *2 (D.C. Cir. July 3, 2007) (citation omitted); <u>Citizens for a Better Env't</u>, 523 U.S. at 103 (causation examines whether there is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"). Plaintiffs must demonstrate that the alleged injury-in-fact "is dependent upon" the challenged agency action. <u>Wilderness Soc'y v. Griles</u>, 824 F.2d 4,

18 (D.C. Cir. 1987).  In this case, NAHB cannot establish the requisite causal link between the action complained of – issuance of NWP 46 – and any injury it might allege.

At the outset, we note that NAHB fails to allege any specific injury-in-fact.  NAHB alleges various interests, including its interest in: "ensur[ing] its members can use their property to the fullest extent allowed by law," Compl. ¶ 4(a); "advocat[ing] for CWA policy that recognizes the Congress did not intend to treat upland ditches as 'navigable waters' or 'waters of the United States,'" id. ¶ 4(b); and "clarify[ing] the extent of CWA 'navigable waters' jurisdiction," id. ¶ 4(c).  NAHB also alleges that its members "often dig, construct, and alter upland ditches," and that "its members are subject to regulation under the actions challenged in this Complaint."  Id. ¶ 5.  However, NAHB fails to allege how these interests are harmed by the Corps' issuance of NWP 46, which would relieve NAHB members of the burden of obtaining an individual permit before they undertake certain activity, but does not require anyone to obtain a permit.

Even assuming, however, that NAHB alleged the requisite injury-in-fact, NAHB's claims still would be subject to dismissal because it cannot establish the requisite causal "link between the injury and the conduct complained of."  Transp. Workers, 2007 WL 1892087, at *2 .  Nothing in NWP 46 or the Corps' March 12, 2007 NWP preamble purports to require a permit or otherwise exercise regulatory jurisdiction over any ditches.  To the contrary, the plain terms of NWP 46 make clear that NWP 46 only applies if a ditch has been "determined to be a water of the United States" and meets other specified criteria.  72 Fed. Reg. at 11,190 (Ex. A).  Further, as NAHB admits, the Corps stated in the NWP preamble that ditches may be subject to the Corps' regulatory jurisdiction only "if they meet the regulatory definition of 'waters of the United

10

States.'"  Compl. ¶ 25 (quoting 72 Fed. Reg. at 11,098); <u>see</u> <u>also</u> 72 Fed. Reg. at 11,098 (Ex. A).

Moreover, NWP 46 expressly defers any determination regarding the jurisdictional status of

ditches to the pre-construction notification process.  The pre-construction notification

requirement ensures that NWP 46 is used only for those ditches that are found to be jurisdictional

waters of the United States and meet other specified criteria.  <u>See</u> 72 Fed. Reg. at 11,142 (Ex. A).

Thus, while NWP 46 authorizes discharges into certain ditches that are determined to be waters

of the United States, NWP 46 itself does not cause any particular ditch to come under the Corps'

regulatory jurisdiction and cannot be tied to NAHB's alleged injury.

        Indeed, the jurisdictional status of ditches is absolutely unchanged as a result of NWP 46.

The issuance of a NWP does not assert Corps regulatory jurisdiction over any particular water

bodies.  It reflects the Corps' determination, pursuant to CWA section 404(e), that categories of

activities involving discharges of dredged or fill material are (1) similar in nature and (2) will

cause minimal individual and cumulative adverse effects on the environment.  33 U.S.C.

§ 1344(e); <u>see</u> 72 Fed. Reg. 11,095 (Ex. A).  Once issued, a NWP provides a mechanism

whereby discharges from these categories of activities into jurisdictional waters of the United

States may be authorized through an expedited process that bypasses the individual permit

process.  In other words, in the absence of a NWP, activities resulting in discharges into

jurisdictional waters of the United States would require an individual permit, pursuant to CWA

section 404(a), 33 U.S.C. § 1344(a).  Thus, activities resulting in discharges into a ditch that is

determined to be a water of the United States would require a section 404 permit whether or not

NWP 46 exists.  By the same token, activities resulting in discharges into a ditch that is not a

11

water of the United States would not require any section 404 permit, notwithstanding the Corps' issuance of NWP 46.

NAHB admits that NWP 46 presumes that the Corps will determine whether ditches are waters of the United States on a "case-by-case basis," Compl. ¶ 25 (quoting 72 Fed. Reg at 11,143), but suggests that this is a change in the Corps' interpretation of its regulations defining "waters of the United States," see Compl. ¶¶ 18 (quoting 33 C.F.R. § 328.3(a)(5) and 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)). NAHB's allegations are inconsistent with the Corps' longstanding interpretation of its own regulations. While NAHB is correct that the Corps noted in the preamble to its 1986 regulations, that "we generally do not consider [drainage and irrigation ditches] to be 'Waters of the United States,'" NAHB ignores the rest of the paragraph in which the Corps expressly "reserves the right on a case-by-case basis to determine that a particular water body within these categories of waters is a water of the United States." 51 Fed. Reg. at 41,217 (attached as "Ex. C"). Thus, the Corps' decision in NWP 46 to continue its case-by-case determination of the jurisdictional status of ditches is entirely consistent with the Corps' longstanding interpretation of its regulations, see 72 Fed. Reg. at 11,143 (Ex. A), and effects no change in the jurisdictional status of any ditches that might be subject to activities by NAHB's members.

The lack of a required nexus between the conduct complained of – issuance of NWP 46 – and the alleged injury – the alleged unlawful exercise of jurisdiction over ditches that NAHB's members might want to fill – is fatal to NAHB's case, as the D.C. Circuit recently concluded in an analogous case. In Transportation Workers, 2007 WL 1892087, at *3, the court considered a challenge to a 2004 Guidance Document issued by the Transportation Security Administration

("TSA"), regarding the definition of the term "conviction."  Plaintiff did not challenge the substance of the Guidance Document; rather, it alleged a procedural injury based on the alleged switch in interpretation of the same term from an earlier 2003 Guidance Document.  The court concluded that the issuance of the 2004 Guidance Document did not change the status quo as it pertained to plaintiff and thus could not have caused his injury – losing his job.  As the court explained, the 2004 Guidance Document was identical to the pre-existing 2003 Guidance Document in all respects relevant to the plaintiff, and thus, the plaintiff would have lost his job even in the absence of the 2004 Guidance Document.  Id. at *5.  In other words, the 2004 Guidance Document itself did not cause the plaintiff's injury and thus the plaintiff could not establish sufficient causation to establish standing.  Id.

Similarly, as demonstrated above, the Corps' issuance of NWP 46 did not change the jurisdictional status of ditches.  As a result of NWP 46, whether a ditch is a jurisdictional water of the United States will continue to be determined on a case-by-case basis, just as it was prior to issuance of NWP 46, and just as it would continue to be in the absence of NWP 46.  Because issuance of NWP 46 does not change the status quo pertaining to the jurisdictional status of ditches, issuance of NWP could not have caused NAHB or its members any injury.  There simply is no causal link between NWP 46 and the allegedly unlawful exercise of jurisdiction over ditches.  In these circumstances, NAHB cannot establish standing.

In sum, NAHB's Complaint asks the Court for an advisory opinion about the scope of the Corps' regulatory jurisdiction, in the absence of any action by the Corps to expand or otherwise define the scope of its authority.  However, Article III limits the Court's authority to real cases and controversies.  NAHB's Complaint does not establish a causal link between the Corps'

issuance of NWP 46 and Plaintiff's alleged injury.  Therefore, NAHB fails to allege a real case or controversy and its Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, NAHB lacks standing under Article III of the Constitution. Accordingly, the Court should dismiss the Complaint with prejudice and enter judgment in the Corps's favor on the pleadings.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

        s/  *Jessica O'Donnell*
JESSICA O'DONNELL  (D.C. Bar #473166)
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: (202) 305-0851
E-mail: jessica.odonnell@usdoj.gov

OF COUNSEL:
Daniel Inkelas
Assistant Counsel for Litigation
Office of the Chief Counsel
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314

Street address:
601 D Street, NW, Suite 8000
Washington, D.C. 20004

*Attorneys for Defendant*

Dated: August 9, 2007

**NAHB, et al. v. Corps, No. 07cv0972 (RMU)**
**Defendants' Motion for Judgment on the Pleadings**
**Exhibit A**



Monday,
March 12, 2007

Part II

# Department of Defense

Department of the Army, Corps of
Engineers

Reissuance of Nationwide Permits; Notice

## DEPARTMENT OF DEFENSE

### Department of the Army, Corps of Engineers

[ZRIN 0710–ZA02]

### Reissuance of Nationwide Permits

**AGENCY:** Army Corps of Engineers, DoD.
**ACTION:** Final notice.

**SUMMARY:** The U.S. Army Corps of Engineers (Corps) is reissuing all existing nationwide permits (NWPs), general conditions, and definitions, with some modifications. The Corps is also issuing six new NWPs, two new general conditions, and 13 new definitions. The effective date for the new and reissued NWPs will be March 19, 2007. These NWPs will expire on March 18, 2012. The NWPs will protect the aquatic environment and the public interest while effectively authorizing activities that have minimal individual and cumulative adverse effects on the aquatic environment.
**DATES:** The NWPs and general conditions will become effective on March 19, 2007.
**ADDRESSES:** U.S. Army Corps of Engineers, Attn: CECW–CO, 441 G Street NW., Washington, DC 20314–1000.

**FOR FURTHER INFORMATION CONTACT:** Mr. David Olson at 202–761–4922 or by e-mail at *david.b.olson@usace.army.mil* or access the U.S. Army Corps of Engineers Regulatory Home Page at *http://www.usace.army.mil/inet/functions/cw/cecwo/reg/.*

**SUPPLEMENTARY INFORMATION:**

### Background

In the September 26, 2006, issue of the **Federal Register** (71 FR 56258), the U.S. Army Corps of Engineers (Corps) published its proposal to reissue 43 existing nationwide permits (NWPs) and issue six new NWPs. The Corps also proposed to reissue its general conditions and add one new general condition.

The Corps proposal is intended to simplify the NWP program while continuing to provide environmental protection, by ensuring that the NWPs authorize only those activities that have minimal individual and cumulative adverse effects on the aquatic environment and satisfy other public interest factors.

As a result of the comments received in response to the September 26, 2006, proposal, we have made a number of changes to the NWPs, general conditions, and definitions to further clarify the permits, facilitate their administration, and strengthen environmental protection. These changes are discussed in the preamble.

The Corps is reissuing the 43 existing NWPs, issuing six new NWPs, reissuing 26 existing general conditions, and issuing one new general condition. The Corps is also reissuing many of the NWP definitions, and providing 13 new definitions. The effective date for these NWPs, general conditions, and definitions is March 19, 2007. These NWPs, general conditions, and definitions expire on March 18, 2012.

While the Administrative Procedure Act requires a substantive rule to be published in the **Federal Register** at least 30 days before its effective date, exceptions to this requirement can be made for good cause (5 U.S.C. 553(d)(3)). We are utilizing this good cause exception to reduce hardships on the regulated public.

### Grandfather Provision for Expiring NWPs

In accordance with 33 CFR 330.6(b), activities authorized by the current NWPs issued on January 15, 2002, that have commenced or are under contract to commence by March 18, 2007, will have until March 18, 2008, to complete the activity under the terms and conditions of the current NWPs.

### Clean Water Act Section 401 Water Quality Certifications (WQC) and Coastal Zone Management Act (CZMA) Consistency Determinations

In the September 26, 2006, **Federal Register** notice and concurrent with letters from Corps Districts to the appropriate state agencies, the Corps requested initial 401 certifications and CZM consistency determinations. This began the Clean Water Act section 401 water quality certification (WQC) and Coastal Zone Management Act (CZMA) consistency determination processes. Today's **Federal Register** notice begins the 60-day period for states, Indian Tribes, and EPA to complete their WQC process for the NWPs. This **Federal Register** notice also provides a 60-day period for coastal states to complete their CZMA consistency determination processes. This 60-day period will end on May 11, 2007.

While the states, Indian Tribes, and EPA complete their WQC processes and the states complete their CZMA consistency determination processes, the use of an NWP to authorize a discharge into waters of the United States is contingent upon obtaining individual water quality certification or a case-specific WQC waiver. Likewise, the use of an NWP to authorize an activity within, or outside, a state's coastal zone that will affect land or water uses or natural resources of that state's coastal zone, is contingent upon obtaining an individual CZMA consistency determination, or a case-specific presumption of CZMA concurrence. We are taking this approach to reduce the hardships on the regulated public that would be caused by a substantial gap in NWP coverage if we were to wait 60 days before these NWPs would become effective.

After the 60-day period, the latest version of any written position take by a state, Indian tribe, or EPA on its WQC for any of the NWPs will be accepted as the state's final position on those NWPs. If the state, Indian tribe, or EPA takes no action by May 11, 2007, WQC will be considered waived for those NWPs.

After the 60-day period, the latest version of any written position take by a state on its CZMA consistency determination for any of the NWPs will be accepted as the state's final position on those NWPs. If the state takes no action by May 11, 2007, CZMA concurrence will be presumed for those NWPs.

### Discussion of Public Comments

#### I. Overview

In response to the September 26, 2006, **Federal Register** notice, we received more than 22,500 comments. We reviewed and fully considered all comments received in response to that notice.

*General Comments*

Many commenters provided general support for the proposal, and some of them stated that the changes are a step forward in improving consistency in the NWP program. Some commenters said that the proposed NWPs provide a balance between environmental protection and allowing development to occur. One commenter said that the NWP program provides sufficient environmental protection, through its general conditions and the ability for the district engineer to exercise discretionary authority to require individual permits. Several commenters stated that the proposed NWPs are simpler, clearer, and easier to understand. Three commenters said that further streamlining is necessary. One commenter recommended adopting a standard numbering system for paragraphs and subparagraphs within the NWP text. Three commenters said that the Corps should retain appropriate references to general conditions in the text of NWPs, for purpose of clarification.

To the extent that it is feasible, we have adopted a standard format for the

habitats in the United States, and the potential impacts of the NWPs on those waters.

The 404(b)(1) Guidelines at 40 CFR 230.7 do not prohibit the consideration of mitigation when making the predictive evaluation of potential individual and cumulative impacts that may be authorized by an NWP. The practice of using compensatory mitigation to ensure minimal adverse individual and cumulative adverse effects is an important component of the NWP program (see 33 CFR 330.1(e)(3)).

Two commenters said that the Corps cannot rely on regional conditioning and discretionary authority to ensure minimal adverse effects. One commenter objected to the ability of the district engineer to exercise discretionary authority to impose conditions on NWP activities. Another commenter stated that in order to ensure minimal adverse effects, pre-construction notification should be required for all NWPs. A number of commenters said that many of the NWPs do not authorize activities that are similar in nature. They said that the Corps is required to explain why activities authorized by an NWP are similar in nature to warrant authorization under a single NWP.

The pre-construction notification review process and discretionary authority are important tools to help ensure that the NWPs authorize only those activities with minimal individual and cumulative adverse effects. If the district engineer reviews a pre-construction notification and determines that the impacts are more than minimal, discretionary authority will be exercised and either the NWP will be conditioned to require mitigation or other actions to ensure minimal adverse effects or an individual permit will be required. The Corps disagrees that pre-construction notification is necessary for all NWP activities. However, the Corps has expanded the scope of activities requiring pre-construction notification. Specifically, all activities conducted under NWPs 7, 8, 17, 21, 29, 31, 33, 34, 37, 38, 39, 40, 42, 44, 45, 46, 49, and 50 now require pre-construction notification, regardless of acreage impacted. This will enable district engineers to better ensure that these permits authorize only activities with minimal impacts.

These NWPs satisfy the requirement under Section 404(e) of the Clean Water Act that the categories of authorized activities be similar in nature. The "similar in nature" provision does not require NWP activities to be identical to each other. We believe that the "categories of activities that are similar in nature" requirement of section 404(e) is to be interpreted broadly, for practical implementation of this general permit program. Nationwide permits, as well as other general permits, are intended to reduce administrative burdens on the Corps and the regulated public, by efficiently authorizing activities that have minimal adverse environmental effects. For each NWP that authorizes activities under Section 404 of the Clean Water Act, the 404(b)(1) Guidelines analysis provides a brief explanation as to why the activities authorized by that NWP are similar in nature.

One commenter said that consideration of impacts resulting from general permits should not be limited to the aquatic environment. This commenter said that Section 404(e) of the Clean Water Act requires permitted activities to have minimal impacts on the environment as a whole.

In addition to the requirement that there be no more than minimal adverse effects on the aquatic environment, activities authorized by NWPs must also result in minimal adverse effects with regards to the Corps public interest factors (see 33 CFR 330.1(d)), which include other components of the environment.

*Compliance With the National Environmental Policy Act*

Many commenters said that the Corps must complete an Environmental Impact Statement for the proposed NWPs. One commenter remarked that the EIS must consider the individual impacts of the NWPs, as well as their cumulative impacts. One comment asserted that mitigation cannot be used to justify using an environmental assessment for NEPA compliance, instead of an Environmental Impact Statement.

The NWPs authorize activities that have minimal individual and cumulative adverse effects on the aquatic environment and satisfy other public interest review factors. The NWPs do not reach the level of significance required for an EIS. The Corps complies with the requirements of the NEPA by preparing an environmental assessment for each NWP. When an NWP is issued, a Finding of No Significant Impact is also issued.

The use of mitigation to make a Finding of No Significant Impact is a standard practice for NEPA compliance. For the purposes of NEPA, mitigation includes avoiding impacts, minimizing impacts, rectifying impacts through repairing or restoring the affected environment, reducing or eliminating impacts over time through preservation and maintenance activities, and compensating for impacts by replacing or providing resources or environments (see 40 CFR 1508.20). Through the requirements of general condition 20, Mitigation, the review of pre-construction notifications by district engineers, and regional and special conditions imposed on the NWPs by division and district engineers, NWP activities use all these forms of mitigation so that the adverse effects of the NWPs do not reach the level of significance that requires an Environmental Impact Statement.

Several commenters stated that the draft decision documents do not satisfy the requirements of the National Environmental Policy Act (NEPA). Some commenters said that the analyses in the decision documents are not based on realistic data. One commenter noted that the average impact is often much less than the acreage limit for the NWP, and said that the mitigation ratios seem too high. One commenter said that the environmental assessments in draft decision documents must contain site-specific analyses. Two commenters asserted that the cumulative effects analyses in the decision documents are inadequate. One commenter said that the cumulative effects analysis should include information on the past use of NWPs, as well as information on other development activities expected to have impacts on protected resources.

We believe the data in the draft decision documents comply with the requirements of NEPA. The estimates of the projected use of the NWPs, the acres impacted, and the amount of compensatory mitigation are based on available data from Corps district offices, and other sources of data, such as surveys. Those data are based on pre-construction notifications and other requests for NWP verifications for activities that do not require pre-construction notification. For those NWP activities that do not require notification, it is necessary to derive estimates. For the decision documents, we must use predictive data, since the future use of an NWP is speculative. Likewise, we cannot provide site-specific information for these environmental assessments, because there are no specific sites or projects associated with the proposed issuance of an NWP. Authorized impacts are usually much less than the acreage limit for an NWP because of the avoidance and minimization required by the terms and conditions of the NWPs. The compensatory mitigation data provided in the decision documents include preservation.

may have a higher likelihood of affecting endangered or threatened species, designated critical habitat, or historic properties. We do not agree that it is necessary to require pre-construction notifications for all NWP activities, because many NWP activities have negligible effects on the aquatic environment and the public interest review factors. We have focused the pre-construction notification requirements on those activities that have the potential for adverse effects that may require additional scrutiny by district engineers, including ESA and/or NHPA consultation.

The pre-construction notification and discretionary authority processes provide flexibility to the Corps regulatory program, by allowing the Corps to focus its limited resources on activities that have the potential to have more than minimal adverse effects on the aquatic environment. We believe that the proposed changes to the pre-construction notification thresholds are necessary for effective implementation of the NWP program, and to address issues of concern at the national level.

One commenter objected to the increased use of the pre-construction notification process and the waivers of limits, such as the 300 linear foot limit for the loss of intermittent and ephemeral stream beds for certain NWPs, to authorize activities by NWP. Another commenter said that it is an administrative burden to require the use of NWP 33 with other NWPs when in-stream construction activities need to occur in dry conditions. This commenter said that NWP 33 should only be used when temporary work is done in waters of the United States, and no other NWP is needed to authorize permanent structures or fills for the activity. One commenter recommended requiring pre-construction notifications for filling waters of the United States that are five or more feet deep, because of the effects on the hydrologic balance of a region.

The ability to waive limits after the review of a pre-construction notification and a written determination that the adverse effects of a particular NWP activity will be minimal provides flexibility to the NWP program, and allows the Corps to focus more of its resources on those activities that require individual permits and may have substantial adverse effects on the aquatic environment and the public interest. In the final NWPs, we have addressed the concern regarding the requirement to use NWP 33 for all temporary construction, access, and dewatering activities. Those changes are discussed in further detail for each

applicable NWP. Many NWP activities that result in a discharge of dredged or fill material into waters of the United States, regardless of water depth, require pre-construction notification, which will allow district engineers to review those activities on a case-by-case basis and assess potential effects on the hydrologic balance of the area in the vicinity of the proposed work.

One commenter said that the pre-construction notification process should be modified to require notification of Indian Tribes, to provide them with the opportunity to comment on proposed activities that may result in the violation of Indian rights. This commenter also said that if the Indian Tribe identifies a potential conflict with Federally-protected Indian rights, the use of the NWPs should not be allowed.

The regional conditioning process, as well as government-to-government consultation between Tribes and the Corps districts where Tribal lands are located, are more appropriate mechanisms to address this commenter's concerns, since there are over 580 Federally-recognized tribes, and each Tribe is likely to have different concerns regarding the implementation of the NWP program. General condition 16 states that no NWP activity may impair reserved Tribal rights. Activities that do impair reserved Tribal rights are not authorized by NWPs. Regional conditions are an effective mechanism for addressing the concerns of a specific Indian Tribe, and can be used to facilitate working relationships between the Corps and the Tribe to help the Corps fulfill its trust responsibilities.

*Clean Water Act Jurisdiction*

On June 19, 2006, the Supreme Court issued its decision in the case of *Rapanos et ux, et al*, v. *United States*. Many commenters cited this decision, as well as other court decisions, and said that the proposed NWPs exceed the Corps jurisdictional authority under Section 404 of the Clean Water Act. Several commenters said that ephemeral streams are not subject to Clean Water Act jurisdiction and should not be covered in the NWPs. Another commenter asserted that intermittent streams are not waters of the United States.

The Rapanos decision, as well as other court decisions made in the past several years, raises questions about the jurisdiction of the Clean Water Act, including Section 404, over some intermittent and ephemeral streams and their adjacent wetlands. The Corps will assess jurisdiction regarding such waters on a case-by-case basis in accordance with evolving case law and

any future guidance that may be issued by appropriate Executive Branch agencies (e.g., the Corps, U.S. Environmental Protection Agency). Under the current regulations and guidance, intermittent and ephemeral streams may meet the regulatory definition of "waters of the United States" and be subject to Clean Water Act jurisdiction. Regulatory jurisdiction over these waterbodies will be determined on a case-by-case basis by district engineers, in accordance with current and future regulations and guidance.

One commenter said that when applying the NWP acreage limits to wetlands, the Corps should not include all wetlands, just those subject to Clean Water Act jurisdiction. One commenter stated that a clearer definition of "navigable waters" is needed. Another commenter said that ditches are not waters of the United States, and impacts to ditches should instead be addressed through state programs. A commenter stated that the Corps must promulgate regulations to define "waters of the United States" for the purposes of implementing the NWP program.

The acreage limits of the NWPs apply only to losses of waters of the United States, including jurisdictional wetlands (see the definition of the term "loss of waters of the United States" in the "Definitions" section of the NWPs). Similarly, linear foot limits apply only to jurisdictional streams. Ditches may also be subject to jurisdiction under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899, if they meet the regulatory definitions of "waters of the United States" and/or "navigable waters of the United States." Waters of the United States are defined at 33 CFR part 328 and navigable waters of the United States are defined at 33 CFR part 329.

*Regional Conditioning of Nationwide Permits*

One commenter stated that regional conditions are unnecessary, and result in too much restriction of the NWPs. A commenter remarked that placing too many regional conditions on the NWPs is contrary to E.O. 13274, Environmental Stewardship and Transportation Infrastructure Project Reviews. One commenter said that regional conditions should not be redundant with the requirements of other agencies, and the streamlining objective of the NWPs should be maintained.

Regional conditions are necessary to account for regional differences in aquatic resource functions, services, and values and to ensure that the NWPs

establishing acreage or linear-foot limits in order to prevent more than minimal impacts to the aquatic environment. On the other hand, several commenters suggested establishing thresholds that would require pre-construction notification only for large-scale activities. One commenter asked how "pre-event" bottom contours of waterbodies would be determined, particularly on those sites with limited or no data, aerial photos, or other information.

This NWP only authorizes the restoration of damaged uplands to the extent that existed before the damage occurred, along with any bank stabilization necessary to protect the restored uplands. This NWP may also authorize minor dredging where necessary to restore material that has washed from the uplands into a neighboring waterbody. Since this NWP only authorizes activities to restore damaged areas to previously existing conditions, we do not believe that it will result in adverse effects that did not previously exist. We believe that the pre-construction notification requirements established for this NWP are necessary to ensure that the proposed activities will result in no more than minimal adverse effects. We recognize that the pre-construction notification requirement imposes an additional burden on project proponents, but we do not believe that it is inequitable or, in most circumstances, substantial. The district engineer has discretionary authority to require an individual permit for any proposed activity that will have more than minimal individual or cumulative adverse effects on the environment, and the pre-construction notification requirement is necessary for the effective use of this authority. When reviewing pre-construction notifications, district engineers will use available information, including documentation provided by permit applicants in accordance with the "Notification" provision of this NWP, to determine the pre-existing conditions. If maps or photographs are not available, the district engineer's judgment will be used.

One commenter stated that this NWP could interfere with tribal rights, including treaty fishing access, and that it could severely impact anadromous salmonid habitat.

District engineers can impose special conditions or assert discretionary authority and require an individual permit for projects that have more than minimal adverse effect on the aquatic environment or other public interest factors. Furthermore, activities

authorized under this NWP must comply with the NWP general conditions, including general condition 16, Tribal Rights, and general condition 2, Aquatic Life Movements.

One commenter requested clarification regarding the effects of changes in the ordinary high water mark after discrete storm or flood events on the scope of activities authorized under this NWP.

Discrete storm or flood events may result in erosion, which can change the ordinary high water mark (OHWM) in non-tidal waters or high tide line (HTL) in tidal waters. For the purposes of this NWP, determinations regarding the location of the OHWM or HTL will be made by the district engineer upon receipt of the pre-construction notification.

One commenter stated that this NWP is unnecessary since repair activities that do not exceed the original scope of the project should be covered by the original authorization. One commenter stated that the Corps should not allow rebuilding of structures located in floodplains where they are likely to be damaged again by subsequent storm events.

This NWP authorizes the restoration of uplands damaged by a discrete event, in cases where there is no available authorization to restore those areas. There would be no original authorization for natural uplands that were damaged by a discrete event. Man-made uplands may have been constructed without the need to obtain a Department of the Army permit.

Activities authorized by NWP must comply with general condition 10, Fills within 100-year Floodplains, which requires all NWP activities to comply with any applicable FEMA-approved state or local floodplain management requirements. We do not agree that there should be a prohibition against rebuilding structures in floodplains. Such decisions should be made by the appropriate state or local authorities, in accordance with FEMA-approved floodplain management requirements.

A number of commenters stated that the terms of the NWP were contradictory with regards to the start date of the authorized activity. These commenters requested clarification as to whether the work must commence within two years from the date of the damages or from the date the pre-construction notification is filed.

We have modified the text of this NWP to clarify that activities authorized by this permit must commence, or be under contract to commence, within two years of the date of damage. This change will make the second paragraph

of this NWP consistent with the pre-construction notification requirements for this NWP. This requirement may be waived by the district engineer if the permittee can show that delays were unavoidable.

One commenter indicated that this NWP should also authorize temporary impacts that are necessary to repair or provide maintenance to damaged structures.

This NWP does not authorize temporary fills, structures, or work required to conduct the upland restoration activities. Those temporary activities may be authorized by NWP 33.

Proposed NWP A is issued as NWP 45, with the modifications discussed above.

NWP 46. *Discharges in Ditches.* This NWP was proposed as NWP B to authorize discharges of dredged or fill material into certain types of ditches and canals. This NWP allows a landowner to return his or her land to its prior condition, but only in those cases where the ditches or canals meet all four criteria specified in the NWP. To qualify for this NWP, those ditches and canals must: (1) Be constructed in uplands, (2) receive water from another water of the United States, (3) divert water to another water of the United States, and (4) be determined to be waters of the United States. These four criteria will limit the use of this NWP to those ditches and canals that generally provide few aquatic resource functions. This proposed NWP does not authorize discharges of dredged or fill material into ditches or canals that were constructed in waters of the United States, such as streams.

Several commenters supported the new NWP. Several commenters stated that the limits for this NWP are too high to prevent more than minimal impacts on the aquatic ecosystem, particularly to flood storage and water quality. Several commenters recommended establishing a 300 linear foot threshold for pre-construction notification and a ½ acre limit on permitted impacts, in order to be consistent with other NWPs. Another commenter stated that filling ditches should not be allowed without an assessment of how the hydrology was altered when the ditch was created and how the hydrology and water quality would be affected if it is filled. Another commenter recommended requiring pre-construction notification for all activities under this NWP, because authorized activities could result in isolating wetlands that are adjacent to the ditches and severing the migratory pathways of aquatic organisms. On the other hand, one commenter stated that since the ditches regulated by this

permit have been determined to provide few aquatic resource functions, the thresholds for pre-construction notification and limits for permitted impacts should be increased. Similarly, one commenter suggested that this NWP should not have any limits, because the regulated ditches are not natural.

This NWP authorizes discharges of dredged or fill material into certain types of ditches. Those ditches must meet all of the criteria listed in the first paragraph of the NWP. To ensure that this NWP is used only to authorize discharges into those types of ditches, and to ensure that those activities result in minimal adverse effects on the aquatic environment, we are requiring pre-construction notification for all activities. To address concerns regarding the jurisdictional status of the waters of the United States other than the ditch to be filled, we have changed the text of this NWP to state that those other waters had to have been waters of the United States prior to the construction of the ditch. Therefore, the jurisdictional status of those waters should remain unchanged after the ditch is filled.

We are retaining the proposed one acre limit for this NWP. We believe that the applicable provisions and terms and conditions, including the general conditions, the pre-construction notification requirements, and the ability of division and district engineers to assert discretionary authority and impose regional and case-specific conditions on this NWP, will ensure that the activities authorized will result in no more than minimal individual and cumulative adverse effects on the aquatic environment.

One commenter stated that a determination of absence or presence of salmonids should be required in channels potentially accessible by anadromous salmonids. Another commenter said that this NWP should not authorize discharges of dredged or fill material into streams.

Potential impacts to salmon species will be considered by district engineers during the review of pre-construction notifications. General condition 2, Aquatic Life Movements, prohibits activities which could disrupt the necessary life cycle movements of aquatic species. If deemed appropriated, this NWP can be regionally conditioned by division engineers to limit or restrict the use of this NWP in waters accessible to anadromous salmonid species. The text of this NWP clearly states that it does not authorize discharges into streams, or streams that have been relocated into uplands.

Several commenters stated that the proposed NWP is contrary to Section 404(e) of the Clean Water Act because it is not a general permit for a category of activities that are similar in nature but rather a permit for a category of waters, and that the Corps has no authority to issue a permit for a category of waters. One commenter suggested that the Corps clarify that the NWP is not limited to situations where the landowner seeks to return his or her land to its prior condition. One commenter requested clarification on whether impacts to roadside ditches for road improvements can be permitted under this NWP, or if NWP 14 would be applicable. Similarly, another commenter suggested that fill for access roads should be included in this NWP.

We expect that this NWP will be mostly used by landowners to return ditches or portions of ditches to their prior upland condition. However, this NWP may also authorize ditch relocation and reshaping activities. To help ensure that this NWP only authorizes activities with minimal individual and cumulative adverse effects on the aquatic environment, we have added language stating that this NWP does not authorize discharges of dredged or fill material that will increase the drainage capacity of the ditch and will drain other waters of the United States. In the event that the ditch is returned to its prior upland condition, the Corps would no longer have regulatory jurisdiction over that ditch. This NWP may authorize discharges of dredged or fill material into roadside ditches, provided those ditches meet all four criteria specified in the first paragraph of this NWP. Access roads may be authorized by other NWPs, regional general permits, or individual permits.

One commenter requested clarification as to whether all four or only one of the four eligibility criteria are needed for a project to be authorized under this NWP. The same commenter requested clarification on the eligibility criterion "receive water from another waters of the United States." One commenter asked whether this NWP could be used to authorize discharges of dredged or fill material into both tidal and non-tidal waters of the United States. One commenter said that this NWP should not authorize discharges into canals, because canals can be large aquatic systems and the adverse environmental effects could be more than minimal.

This NWP applies only to those ditches that meet all four criteria specified in the first paragraph of the NWP. The second criterion for eligible ditches refers to situations where the ditch constructed in uplands receives surface water flow from another water of the United States that existed prior to the construction of that upland ditch.

To ensure that this NWP authorizes only those activities with minimal individual and cumulative adverse effects on the aquatic environment, we have limited this NWP to discharges of dredged or fill material into non-tidal ditches. In addition, it does not authorize discharges of dredged or fill material into navigable waters of the United States (i.e., section 10 waters). We have removed the word "canal" from this NWP, to provide further clarity since canals may be navigable waters of the United States. Discharges into a non-tidal ditch that flows into a tidal water could be covered under NWP 46, but not discharges into a "tidal" ditch, *i.e.*, one into which tidal waters flow.

A number of commenters questioned or requested clarification of Corps jurisdiction over ditches following the Supreme Court decisions in Rapanos and Carabell. One commenter requested clarification on whether the term "water of the United States" includes wetlands or only waterbodies, and whether a ditch connecting two wetlands would qualify for authorization under this NWP. One commenter suggested providing guidelines for or examples of the information required to determine that a ditch was constructed in uplands.

This NWP can be used to authorize discharges of dredged or fill material into ditches that meet the four criteria in the first paragraph, as well as the other terms and conditions of this NWP. The waters of the United States other than the ditch constructed in uplands may consist of wetlands, open waters, or both. This preamble does not address the limits of jurisdiction after Rapanos and Carabell.

Data used to determine whether a ditch was constructed in uplands may be obtained from a variety of sources, such as aerial photographs, soil surveys, property maps, plans, plots or plats, previous jurisdictional determinations and data sheets, topographical maps, wetland inventory maps, and photographs.

One commenter stated that mitigation should be required for impacts to wetlands and aquatic life that may be established in those ditches. In contrast, another commenter stated that requiring mitigation for reversion to a prior upland condition is excessive and unreasonable.

We do not believe that it would be appropriate or practical to establish a national standard requiring mitigation

for all activities authorized by this NWP. The need for compensatory mitigation to ensure minimal individual and cumulative adverse effects will be made by district engineers on a case-by-case basis, in response to pre-construction notifications. We believe that the provisions of general conditions 27 and 20 will allow the district engineer to determine if any compensatory mitigation is needed to reduce the effects of the activities authorized under this permit to the minimal level.

One commenter suggested that the one-acre limit should not apply if the impacted ditch is replaced with another ditch that would perform the same functions.

Although this NWP may be used to authorize discharges of dredged or fill material into ditches for the purpose of relocating those ditches, the one acre limit applies to the loss of waters of the United States that results from the discharge of dredged or fill material into the existing ditch.

One commenter requested clarification on how the "constructed in uplands" criterion reconciles with Corps policy at 51 FR 41217, under which ditches excavated on dry land are generally not waters of the United States.

The proposed NWP is consistent with the policy established in the November 13, 1986 **Federal Register** Notice (51 FR 41217), because that policy also states that the Corps reserves the right on a case-by-case basis to determine whether non-tidal ditches excavated on dry land or other features constitute waters of the United States.

One commenter requested clarification on how this NWP reconciles with the Section 404 exemption for construction and maintenance of irrigation ditches at 33 CFR 323.4(a)(3).

The Section 404 exemption at 33 CFR 323.4(a)(3) applies to construction and maintenance of irrigation ditches or the maintenance of drainage ditches. This NWP authorizes activities not covered in the exemption, such as discharges of dredged or fill material to restore the area to its previous upland condition.

One commenter stated that this NWP should not be issued because it is contrary to the Congressional intention that ditches should be regulated as point sources and not as navigable waters.

This preamble does not address the limits of Clean Water Act jurisdiction. To the extent that ditches are determined to be waters of the United States, this permit provides authorization for discharges of dredged

or fill material into them provided all conditions for its use are met.

One commenter recommended providing definitions for "ditch" and "canal".

We believe that district engineers should maintain the discretion to determine on a case-by-case basis whether particular features are ditches or canals and also are waters of the United States.

Proposed NWP B is issued as NWP 46 with the modifications discussed above.

NWP 47. *Pipeline Safety Program Designated Time Sensitive Inspections and Repairs.* In the September 26, 2006, **Federal Register** notice, we proposed this NWP (as proposed NWP C) to authorize the inspection, repair, rehabilitation, or replacement of any currently serviceable structure or fill for pipelines that are determined to be time-sensitive in accordance with the Pipeline and Hazardous Materials Safety Administration's Pipeline Safety Program (PHP), including its criteria at 49 CFR parts 192 and 195.

Thirteen comment letters were received concerning this proposed NWP with six expressing strong support for its issuance but also inquiring about the applicability of general conditions 17 (Endangered Species) and 18 (Historic Properties) to the use of the permit. Six commenters recommended that the Corps enter into programmatic ESA consultation with PHP and the U.S. Fish and Wildlife Service and the National Marine Fisheries Service.

This NWP only authorizes activities that are included in the U.S. Department of Transportation's Pipeline Repair and Environmental Guidance System (PREGS). The PHP is the lead Federal agency for these activities and, as such, conducts any Section 7 consultation required under the Endangered Species Act and consultation required under Section 106 of the National Historic Preservation Act. In cases where PHP has not conducted consultation required by either Section 7 of the Endangered Species Act, or Section 106 of the National Historic Preservation Act, permittees are required by 33 CFR 330.4(f) and (g) to notify the Corps if there are threatened or endangered species or critical habitat, or historic properties that might be affected or are in the vicinity of the project.

One commenter declared that "inspections" should be removed from the list of authorized activities since technology exists which allows pipeline operators to evaluate a pipeline without the need to visually inspect it. One commenter said that this NWP should not authorize the repair of pipelines that have deteriorated as a result of neglect.

Two commenters stated that acreage limits should be placed on the NWP. One commenter remarked that access roads should be authorized by the NWP because problems will occur when an activity requires use of multiple NWPs and one of the other NWPs has an acreage limit.

We disagree with the first two comments of the preceding paragraph. Pipeline inspections are critical activities related to the repair of these pipelines. In certain instances it is necessary that the pipeline be visually inspected, and this permit allows excavation to expose the pipeline. Impacts authorized under this NWP will be temporary in nature so the aquatic resources will recover over time. This NWP provides Department of the Army authorization for the repair, rehabilitation, or replacement of currently serviceable pipelines. These pipelines are unlikely to become unserviceable as a result of neglect, since operators are required to periodically inspect these pipelines and make necessary repairs or replacements. We do not believe acreage limits are necessary, given the nature of the category of activities authorized by this NWP. Access roads will not generally need to be constructed to conduct the pipeline inspection and repair, since access roads would likely have been built at the time the pipeline was constructed, or the terrain will not impede access to the pipeline. If temporary access roads are necessary to conduct the pipeline inspection and repair activity, they are authorized by this NWP as long as they are removed upon completion of the work. This NWP requires that all temporary structures and fill be removed and the area restored to preconstruction elevations. We have modified paragraph (c) of this NWP so that it is consistent with general condition 13, Removal of Temporary Fills.

One commenter inquired as to why temporary activities are included in the proposed NWP when this work is being removed from other NWPs that authorize maintenance. Two commenters requested we add a pre-construction notification requirement for environmentally sensitive areas. One commenter said the pre-construction notification should be required for all activities. Two commenters were against and one commenter supported prohibiting division engineers from placing regional conditions on the NWP.

Since the objective of this NWP is to authorize inspections and repairs for eligible pipelines in a timely manner, the NWP authorizes temporary activities necessary to conduct the inspection,

non-tidal wetlands adjacent to tidal waters.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) If reclamation is required by other statutes, then a copy of the reclamation plan must be submitted with the pre-construction notification. (Sections 10 and 404)

45. *Repair of Uplands Damaged by Discrete Events.* This NWP authorizes discharges of dredged or fill material, including dredging or excavation, into all waters of the United States for activities associated with the restoration of upland areas damaged by storms, floods, or other discrete events. This NWP authorizes bank stabilization to protect the restored uplands. The restoration of the damaged areas, including any bank stabilization, must not exceed the contours, or ordinary high water mark, that existed before the damage occurred. The district engineer retains the right to determine the extent of the pre-existing conditions and the extent of any restoration work authorized by this NWP. The work must commence, or be under contract to commence, within two years of the date of damage, unless this condition is waived in writing by the district engineer. This NWP cannot be used to reclaim lands lost to normal erosion processes over an extended period.

Minor dredging is limited to the amount necessary to restore the damaged upland area and should not significantly alter the pre-existing bottom contours of the waterbody.

*Notification:* The permittee must submit a pre-construction notification to the district engineer (see general condition 27) within 12-months of the date of the damage. The pre-construction notification should include documentation, such as a recent topographic survey or photographs, to justify the extent of the proposed restoration. (Sections 10 and 404)

Note: Uplands lost as a result of a storm, flood, or other discrete event can be replaced without a section 404 permit, if the uplands are restored to the ordinary high water mark (in non-tidal waters) or high tide line (in tidal waters). (See also 33 CFR 328.5.)

46. *Discharges in Ditches.* Discharges of dredged or fill material into non-tidal ditches that are: (1) Constructed in uplands, (2) receive water from an area determined to be a water of the United States prior to the construction of the ditch, (3) divert water to an area determined to be a water of the United States prior to the construction of the ditch, and (4) are determined to be

waters of the United States. The discharge must not cause the loss of greater than one acre of waters of the United States.

This NWP does not authorize discharges of dredged or fill material into ditches constructed in streams or other waters of the United States, or in streams that have been relocated in uplands. This NWP does not authorize discharges of dredged or fill material that increase the capacity of the ditch and drain those areas determined to be waters of the United States prior to construction of the ditch.

*Notification:* The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity. (See general condition 27.) (Section 404)

47. *Pipeline Safety Program Designated Time Sensitive Inspections and Repairs.* Activities required for the inspection, repair, rehabilitation, or replacement of any currently serviceable structure or fill for pipelines that have been identified by the Pipeline and Hazardous Materials Safety Administration's Pipeline Safety Program (PHP) within the U.S. Department of Transportation as time-sensitive (see 49 CFR parts 192 and 195) and additional maintenance activities done in conjunction with the time-sensitive inspection and repair activities. All activities must meet the following criteria:

(a) Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable when temporary structures, work and discharges, including cofferdams, are necessary for construction activities or access fills or dewatering of construction sites;

(b) Material resulting from trench excavation may be temporarily sidecast into waters of the United States for no more than three months, provided that the material is not placed in such a manner that it is dispersed by currents or other forces. The district engineer may extend the period of temporary side casting for no more than a total of 180 days, where appropriate. The trench cannot be constructed or backfilled in such a manner as to drain waters of the United States (e.g., backfilling with extensive gravel layers, creating a french drain effect);

(c) Temporary fill must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The affected areas must be revegetated, as appropriate;

(d) In wetlands, the top 6 to 12 inches of the trench should normally be backfilled with topsoil from the trench so that there is no change in preconstruction contours;

(e) To the maximum extent practicable, the restoration of open waters must be to the pre-construction course, condition, capacity, and location of the waterbody;

(f) Any exposed slopes and stream banks must be stabilized immediately upon completion of the project;

(g) Additional maintenance activities done in conjunction with the time-sensitive inspection or repair must not result in additional losses of waters of the United States; and,

(h) The permittee is a participant in the Pipeline Repair and Environmental Guidance System (PREGS).

*Reporting:* The permittee must submit a post construction report to the PHP within seven days after completing the work. The report must be submitted electronically to PHP via PREGS. The report must contain the following information: Project sites located in waters of the United States, temporary access routes, stream dewatering sites, temporary fills and temporary structures identified on a map of the pipeline corridor; photographs of the pre- and post-construction work areas located in waters of the United States; and a list of best management practices employed for each pipeline segment shown on the map. (Section 10 and 404)

Note: Division engineers may modify this NWP by adding regional conditions to protect the aquatic environment, as long as those regional conditions do not require pre-construction notification or other actions that would delay time sensitive inspections and repairs. Examples of appropriate regional conditions include best management practices.

48. *Existing Commercial Shellfish Aquaculture Activities.* This NWP authorizes the installation of buoys, floats, racks, trays, nets, lines, tubes, containers, and other structures necessary for the continued operation of the existing commercial aquaculture activity. This NWP also authorizes discharges of dredged or fill material necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting activities. Rafts and other floating structures must be securely anchored and clearly marked.

This NWP does not authorize new operations or the expansion of the project area for an existing commercial shellfish aquaculture activity. This NWP does not authorize the cultivation of new species (i.e., species not previously cultivated in the waterbody). This NWP

compensatory mitigation for wetland losses.

(g) Permittees may propose the use of mitigation banks, in-lieu fee arrangements or separate activity-specific compensatory mitigation. In all cases, the mitigation provisions will specify the party responsible for accomplishing and/or complying with the mitigation plan.

(h) Where certain functions and services of waters of the United States are permanently adversely affected, such as the conversion of a forested or scrub-shrub wetland to a herbaceous wetland in a permanently maintained utility line right-of-way, mitigation may be required to reduce the adverse effects of the project to the minimal level.

21. *Water Quality.* Where States and authorized Tribes, or EPA where applicable, have not previously certified compliance of an NWP with CWA Section 401, individual 401 Water Quality Certification must be obtained or waived (see 33 CFR 330.4(c)). The district engineer or State or Tribe may require additional water quality management measures to ensure that the authorized activity does not result in more than minimal degradation of water quality.

22. *Coastal Zone Management.* In coastal states where an NWP has not previously received a state coastal zone management consistency concurrence, an individual state coastal zone management consistency concurrence must be obtained, or a presumption of concurrence must occur (see 33 CFR 330.4(d)). The district engineer or a State may require additional measures to ensure that the authorized activity is consistent with state coastal zone management requirements.

23. *Regional and Case-By-Case Conditions.* The activity must comply with any regional conditions that may have been added by the Division Engineer (see 33 CFR 330.4(e)) and with any case specific conditions added by the Corps or by the state, Indian Tribe, or U.S. EPA in its section 401 Water Quality Certification, or by the state in its Coastal Zone Management Act consistency determination.

24. *Use of Multiple Nationwide Permits.* The use of more than one NWP for a single and complete project is prohibited, except when the acreage loss of waters of the United States authorized by the NWPs does not exceed the acreage limit of the NWP with the highest specified acreage limit. For example, if a road crossing over tidal waters is constructed under NWP 14, with associated bank stabilization authorized by NWP 13, the maximum acreage loss of waters of the United

States for the total project cannot exceed 1/3-acre.

25. *Transfer of Nationwide Permit Verifications.* If the permittee sells the property associated with a nationwide permit verification, the permittee may transfer the nationwide permit verification to the new owner by submitting a letter to the appropriate Corps district office to validate the transfer. A copy of the nationwide permit verification must be attached to the letter, and the letter must contain the following statement and signature:

"When the structures or work authorized by this nationwide permit are still in existence at the time the property is transferred, the terms and conditions of this nationwide permit, including any special conditions, will continue to be binding on the new owner(s) of the property. To validate the transfer of this nationwide permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below."

_____
(Transferee)

_____
(Date)

26. *Compliance Certification.* Each permittee who received an NWP verification from the Corps must submit a signed certification regarding the completed work and any required mitigation. The certification form must be forwarded by the Corps with the NWP verification letter and will include:

(a) A statement that the authorized work was done in accordance with the NWP authorization, including any general or specific conditions;

(b) A statement that any required mitigation was completed in accordance with the permit conditions; and

(c) The signature of the permittee certifying the completion of the work and mitigation.

27. *Pre-Construction Notification.* (a) *Timing.* Where required by the terms of the NWP, the prospective permittee must notify the district engineer by submitting a pre-construction notification (PCN) as early as possible. The district engineer must determine if the PCN is complete within 30 calendar days of the date of receipt and, as a general rule, will request additional information necessary to make the PCN complete only once. However, if the prospective permittee does not provide all of the requested information, then the district engineer will notify the prospective permittee that the PCN is still incomplete and the PCN review

process will not commence until all of the requested information has been received by the district engineer. The prospective permittee shall not begin the activity:

(1) Until notified in writing by the district engineer that the activity may proceed under the NWP with any special conditions imposed by the district or division engineer; or

(2) If 45 calendar days have passed from the district engineer's receipt of the complete PCN and the prospective permittee has not received written notice from the district or division engineer. However, if the permittee was required to notify the Corps pursuant to general condition 17 that listed species or critical habitat might be affected or in the vicinity of the project, or to notify the Corps pursuant to general condition 18 that the activity may have the potential to cause effects to historic properties, the permittee cannot begin the activity until receiving written notification from the Corps that is "no effect" on listed species or "no potential to cause effects" on historic properties, or that any consultation required under Section 7 of the Endangered Species Act (see 33 CFR 330.4(f)) and/or Section 106 of the National Historic Preservation (see 33 CFR 330.4(g)) is completed. Also, work cannot begin under NWPs 21, 49, or 50 until the permittee has received written approval from the Corps. If the proposed activity requires a written waiver to exceed specified limits of an NWP, the permittee cannot begin the activity until the district engineer issues the waiver. If the district or division engineer notifies the permittee in writing that an individual permit is required within 45 calendar days of receipt of a complete PCN, the permittee cannot begin the activity until an individual permit has been obtained. Subsequently, the permittee's right to proceed under the NWP may be modified, suspended, or revoked only in accordance with the procedure set forth in 33 CFR 330.5(d)(2).

(b) *Contents of Pre-Construction Notification:* The PCN must be in writing and include the following information:

(1) Name, address and telephone numbers of the prospective permittee;

(2) Location of the proposed project;

(3) A description of the proposed project; the project's purpose; direct and indirect adverse environmental effects the project would cause; any other NWP(s), regional general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity. The description should be sufficiently detailed to allow the district engineer to

**NAHB, et al. v. Corps, No. 07cv0972 (RMU)**
**Defendants' Motion for Judgment on the Pleadings**
**Exhibit B**



Tuesday,
September 26, 2006

Part III

# Department of Defense

Department of the Army, Corps of Engineers

Proposal To Reissue and Modify Nationwide Permits; Notice

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**[ZRIN 0710–ZA02]**

**Proposal To Reissue and Modify Nationwide Permits**

**AGENCY:** Army Corps of Engineers, DoD.

**ACTION:** Notice.

**SUMMARY:** The U.S. Army Corps of Engineers (Corps) is soliciting comments for the reissuance of the existing nationwide permits (NWPs), general conditions, and definitions, with some modifications. The Corps is also proposing to issue six new NWPs and one new general condition. The reissuance process starts with today's publication of the proposed NWPs in the **Federal Register** for a 60-day comment period. The purpose of this **Federal Register** notice is to solicit comments on the proposed new and modified NWPs, as well as the NWP general conditions and definitions. Shortly after the publication of this **Federal Register** notice, each Corps district will publish a public notice to solicit comments on their proposed regional conditions for the new and modified NWPs. The comment period for these district public notices will be 45 days.

**DATES:** Submit comments on or before November 27, 2006.

**ADDRESSES:** You may submit comments, identified by docket number COE–2006–0005 and/or ZRIN 0710–ZA02, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*E-mail:* david.b.olson@usace.army.mil. Include the docket number, COE–2006–0005, and/or the ZRIN number, 0710–ZA02, in the subject line of the message.

*Fax:* 202–761–0140.

*Mail:* U.S. Army Corps of Engineers, Attn: CECW–OR/MVD (David B. Olson), 441 G Street NW., Washington, DC 20314–1000.

*Hand Delivery/Courier:* Due to security requirements, we cannot receive comments by hand delivery or courier.

*Instructions:* Direct your comments to docket number COE–2006–0005 and/or ZRIN 0710–ZA02. All comments received will be included in the public docket without change and may be made available on-line at *http://www.regulations.gov,* including any personal information provided, unless the commenter indicates that the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI, or otherwise protected, through regulations.gov or e-mail. The regulations.gov Web site is an anonymous access system, which means we will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail directly to the Corps without going through regulations.gov, your e-mail address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, we recommend that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If we cannot read your comment because of technical difficulties and cannot contact you for clarification, we may not be able to consider your comment. Electronic comments should avoid the use of any special characters, any form of encryption, and be free of any defects or viruses.

*Docket:* For access to the docket to read background documents or comments received, go to regulations.gov. All documents in the docket are listed. Although listed in the index, some information is not publicly available, such as CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form.

Consideration will be given to all comments received within 60 days of the date of publication of this notice.

**FOR FURTHER INFORMATION CONTACT:** Mr. David Olson at 202–761–4922 or by e-mail at *david.b.olson@usace.army.mil* or access the U.S. Army Corps of Engineers Regulatory Home Page at *http://www.usace.army.mil/inet/functions/cw/cecwo/reg/.*

**SUPPLEMENTARY INFORMATION:**

**Background**

The current nationwide permits (NWPs), which were published in the January 15, 2002, issue of the **Federal Register** (67 FR 2020) expire on March 18, 2007. With this **Federal Register** notice, we are beginning the process for reissuing the NWPs so that the reissued NWPs will be in effect as the current NWPs expire.

Section 404(e) of the Clean Water Act provides the statutory authority for the Secretary of the Army, after notice and opportunity for public hearing, to issue general permits on a nationwide basis for any category of activities involving discharges of dredged or fill material into waters of the United States. Activities authorized by NWPs must be similar in nature, cause only minimal adverse environmental effects when performed separately, and cause only minimal cumulative adverse effect on the aquatic environment. Nationwide permits can also be issued to authorize activities pursuant to Section 10 of the Rivers and Harbors Act of 1899. The NWP program is designed to provide timely authorizations for the regulated public while protecting the Nation's aquatic resources.

One goal of today's notice is to simplify the text of the reissued NWPs. Since NWPs were first issued in 1977, the NWP program has become increasingly complex. With each issuance or reissuance of NWPs, the text of the permits and the general conditions has become lengthier, and in some cases, redundant language was added that may make them more difficult to comprehend. Compliance with the NWPs and their general conditions is more difficult if users of those permits cannot easily understand the requirements of the NWPs and what they authorize. Simplifying the text will facilitate compliance with the NWPs and thus help protect the aquatic environment.

Federal agencies are required by Executive Order 12866, Regulatory Planning and Review, to draft regulations that are simple and easy to understand, to minimize uncertainty. This principle is also applicable to the NWPs, which are now considered to be rules under the Administrative Procedures Act (APA). In addition, a Presidential Memorandum issued on June 1, 1998, requires Federal agencies to use plain language in government writing, so that rules and other documents are clear to the public and others.

We are proposing to revise the text of the NWPs, general conditions, and definitions so that they are clearer, more concise, and can be more easily understood by the regulated public, government personnel, and interested parties, while retaining terms and conditions that protect the aquatic environment. Making the text of the NWPs clearer and easier to understand will also facilitate compliance with these permits, which will benefit the aquatic environment. This proposal also reflects the Corps support of the administration's goal of improving regulatory efficiency, by making the

(OHWM) that existed before the damaging event occurred. Bank stabilization activities that extend beyond the pre-event OHWM may be authorized by NWP 13, a regional general permit, or an individual permit.

We are proposing to replace the 50 cubic yard limit for minor dredging to remove obstructions from the adjacent waterbody with a condition limiting minor dredging to the minimum necessary to restore bottom contours of the waterbody to their pre-event state. District engineers will review PCNs involving minor dredging for emergency repair activities, to ensure that the authorized work will result in minimal adverse environmental effects. We are also proposing to add a condition which states that project proponents may be required to obtain separate DA authorization, if temporary structures or discharges are necessary to conduct the rehabilitation or repair activity. Separate DA authorization would be required for temporary structures installed in navigable waters of the United States and/or temporary discharges of dredged or fill material into waters of the United States that are necessary to conduct emergency repair activities. The separate DA authorization may be provided by NWP 33, a regional general permit, or an individual permit.

In the "Note" at the end of this NWP, we are proposing to modify text taken from paragraph (iii) of NWP 3 to clarify that restoring uplands up to the OHWM in non-tidal waters or the high tide line in tidal waters after a storm, flood, or other discrete event does not require a section 404 permit. If discharges of dredged or fill material to restore uplands lost as a result of a discrete event occur landward of the OHWM or high tide line, and there are no jurisdictional waters or wetlands landward of the OHWM or high tide line, a section 404 permit is not required because there would be no discharge of dredged or fill material into waters of the United States. In response to a PCN, the district engineer will determine, on a case-by-case basis, the location of the OHWM and the high tide line. In the "Note," we are also proposing to include a reference to 33 CFR 328.5, which addresses changes in limits to waters of the United States.

In response to a PCN, the district engineer can exercise discretionary authority and require an individual permit if the proposed activity will result in more than minimal adverse effects on the aquatic environment, individually and cumulatively.

*NWP B. Discharges into Ditches and Canals.* We are proposing a new NWP to authorize discharges of dredged or fill material into certain types of ditches and canals that are determined to be waters of the United States. The proposed NWP will allow a landowner to return his or her land to its prior condition, but only in those cases where the ditches or canals meet all three criteria specified in the NWP. To qualify for this NWP, those ditches and canals must be: (1) Constructed in uplands, (2) receive water from another water of the United States, and (3) divert water to another water of the United States. These three criteria will limit the use of this NWP to those ditches and canals that generally provide few aquatic resource functions. This proposed NWP does not authorize discharges of dredged or fill material into ditches or canals that were constructed in waters of the United States, such as streams.

We are proposing a one acre limit for this NWP. We believe the one acre limit will authorize those activities that have minimal adverse effects on the aquatic environment, individually and cumulatively. Division engineers can regionally condition this NWP to lower the acreage limit or otherwise limit its use. We are proposing to require a PCN if the dredged or fill material will be discharged into more than 500 linear feet of ditch or canal. This proposed NWP is limited to activities that only require section 404 authorization. An individual permit, regional general permit, or another NWP would be needed to authorize discharges of dredged or fill material into ditches and canals that are determined to be navigable waters of the United States under section 10 jurisdiction.

We are seeking comments on this proposed new NWP, including its terms and conditions, such as the proposed one acre limit.

*NWP C. Pipeline Safety Program Designated Time Sensitive Inspections and Repairs.* We are proposing a new NWP to authorize the inspection, repair, rehabilitation, or replacement of any currently serviceable structure or fill for pipelines that are determined to be time-sensitive in accordance with the Pipeline and Hazardous Materials Safety Administration's Pipeline Safety Program (PHP), including its criteria at 49 CFR parts 192 and 195. This NWP would authorize time-sensitive pipeline inspection, repair, rehabilitation, or replacement activities in all waters of the United States, including navigable waters.

The proposed NWP would significantly improve a participating pipeline operator's ability to complete inspection and repair activities, and reduce environmental impacts due to pipeline ruptures. An Interagency Committee (IAC) was convened to implement Section 16 of the Pipeline Safety Improvement Act of 2002 (*see* 49 U.S.C. 60133). The proposed NWP will help satisfy the requirements of this act. The environmental compliance and enforcement programs of the agencies participating in the interagency committee would also help ensure compliance with environmental statutes such as the Endangered Species Act and Section 106 of the National Historic Preservation Act.

Although many of these activities could be authorized by NWPs 3 or 12, we are proposing to issue this NWP so that a time-sensitive inspection and/or repair that meets PHP criteria can proceed without submitting a PCN to the district engineer. To ensure that this NWP would allow these inspections and repairs to proceed in a timely manner, division engineers are not authorized to regionally condition this NWP. This proposed NWP requires project proponents to: (1) Participate in PHP's early notification program, (2) utilize the Pipeline Repair and Environmental Guidance System (PREGS), (3) follow the agreed upon Recommended Best Management Practices (RMBPs), and (4) submit post-construction reports within 7 days of completing the work via PREGS. District engineers can monitor the pipeline inspection and/or repair activity and the use of this NWP through the post-construction reporting in PREGS to ensure that the NWP authorizes activities that have minimal individual and cumulative adverse effects on the aquatic environment. Suspension or revocation of this NWP may occur only if the division engineer has formally determined, in accordance with the procedures at 33 CFR 330.5(c), that the NWP would result in more than minimal adverse environmental effects, either individually or cumulatively, within a particular district, watershed, or other geographic region. District engineers must follow the procedures at 33 CFR 330.5(d) to suspend or revoke a case-specific authorization under this NWP.

The Pipeline and Hazardous Materials Safety Administration and the IAC developed PREGS. Participating pipeline operators and agencies have access to PREGS. This system will provide early notification to participating agencies for upcoming pipeline inspection and repair activities.

The RBMPs have been developed through the IAC to address habitat and resource issues at the national level. These RBMPs apply to pipeline inspection and repair activities, as well as post-activity remediation actions. The RMBPs are available on PREGS.

**NAHB, et al. v. Corps, No. 07cv0972 (RMU)**
**Defendants' Motion for Judgment on the Pleadings**
**Exhibit C**

**41206    Federal Register / Vol. 51, No. 219 / Thursday, November 13, 1986 / Rules and Regulations**

## DEPARTMENT OF DEFENSE

**Corps of Engineers, Department of the Army**

**33 CFR Parts 320, 321, 322, 323, 324, 325, 326, 327, 328, 329 and 330**

**Final Rule for Regulatory Programs of the Corps of Engineers**

**AGENCY:** Corps of Engineers, Army Department, DOD.

**ACTION:** Final rule.

**SUMMARY:** We are hereby issuing final regulations for the regulatory program of the Corps of Engineers. These regulations consolidate earlier final, interim final, and certain proposed regulations along with numerous changes resulting from the consideration of the public comments received. The major changes include modifications that provide for more efficient and effective management of the decision-making processes, clarifications and modifications of the enforcement procedures, modifications to the nationwide permit program, revision of the permit form, and implementation of special procedures for artificial reefs as required by the National Fishing Enhancement Act of 1984.

**EFFECTIVE DATE:** January 12, 1987.

**FOR FURTHER INFORMATION CONTACT:** Mr. Sam Collinson or Mr. Bernie Goode, HQDA (DAEN–CWO–N), Washington, DC 20314–1000, (202) 272–0199.

**SUPPLEMENTARY INFORMATION:**

### Consolidation of Corps Permit Regulations

These final regulations consolidate and complete the six following rulemaking events affecting the Corps regulatory program:

1. *Interim Final Regulations.* These regulations contained Parts 320–330 and were published (47 FR 31794) on July 22, 1982, to incorporate policy and procedural changes resulting from legislative, judicial, and administrative actions that had occurred since the previous final regulations had been published in 1977. Because it had been almost two years since we had proposed changes to the 1977 regulations, we published the 1982 regulations as "interim final" and asked for public comments. We received nearly 200 comments.

2. *Proposed Regulatory Reform Regulations.* On May 12, 1983, we published (48 FR 21466) proposed revisions to the interim final regulations to implement the May 7, 1982, directives of the Presidential Task Force on Regulatory Relief. The Task Force

directed the Army to reduce uncertainty and delay, give the states more authority and responsibility, reduce conflicting and overlapping policies, expand the use of general permits, and redefine and clarify the scope of the permit program. Since these regulations proposed changes to our existing nationwide permits and the addition of two new nationwide permits, a public hearing was held in Washington, DC, on October 12, 1983, to obtain comments on these proposed changes. As a result of the public comments received, nearly 500 in response to the proposed regulations and 22 at the public hearing, we have determined that some of the proposed revisions should be adopted and some should not. We have adopted some of the provisions that were designed to clarify policies for evaluating permit applications, to revise certain permit processing procedures, to add additional conditions to existing nationwide permits, and to modify certain nationwide permit procedures. We have not adopted some of the other proposed changes, including the two proposed new nationwide permits.

3. *Settlement Agreement Final Regulations.* On October 5, 1984, we published (49 FR 39478) final regulations to implement a settlement agreement reached in a suit filed by 16 environmental organizations in December of 1982 against the Department of the Army and the Environmental Protection Agency (*NWF v. Marsh*) concerning several provisions of the July 22, 1982, interim final regulations. The court approved the settlement agreement on February 10, 1984, and on March 29, 1984, we published (49 FR 12660) the implementing proposed regulations. We received over 150 comments on these proposed regulations covering a full range of views. Those comments which were applicable to the provisions of the March 29, 1984, proposals were considered and addressed in the final regulations published on October 5, 1984. The remaining comments have been considered in the development of the final regulations we are issuing today.

In the October 5, 1984, final rule there were several new provisions relating to the 404(b)(1) guidelines. In 33 CFR 320.4(a)(1) we clarified the fact that no 404 permit can be issued unless it complies with the 404(b)(1) guidelines.

If a proposed action complies with the guidelines, a permit will be issued unless the district engineer determines that it will be contrary to the public interest. In 33 CFR 323.6(a) we stated that district engineers will deny permits for discharges which fail to comply with

the 404(b)(1) guidelines, unless the economic impact on navigation and anchorage necessitates permit issuance pursuant to section 404(b)(2) of the Clean Water Act. Although no 404 permit can be issued unless compliance with the 404(b)(1) guidelines is demonstrated (i.e., compliance is a prerequisite to issuance), the 404(b)(1) evaluation is conducted simultaneously with the public interest review set forth in 33 CFR 320.4(a).

4. *Proposed Permit Form Regulations.* On May 23, 1985, we published (50 FR 21311) proposed revisions to 33 CFR Part 325 (Appendix A), which contains the standard permit form used for the issuance of Corps permits and the related provisions concerning special conditions. This proposal provided for the complete revision of the permit form and its related provisions to make them easier for permittees to understand. General permit conditions were written in plain English and greatly reduced in number; unnecessary material was deleted; and material which is informational in nature was reformatted under a "FURTHER INFORMATION" heading. We received 18 comments on this proposal.

5. *Proposed Regulations to Implement the National Fishing Enhancement Act of 1984 (NFEA).* On July 26, 1985, we published (50 FR 30479) proposed regulations to implement a portion of the Corps regulatory responsibilities pursuant to the NFEA. Specialized procedures relative to the processing of Corps permits for artificial reefs were proposed for inclusion in Parts 322 and 325. Eight organizations commented on these proposed regulations. The NFEA also authorizes the Secretary of the Army to assess a civil penalty on any person who, after notice and an opportunity for a hearing, is found to have violated any provision of a permit issued for an artificial reef. Procedures for implementing such civil penalties will be proposed at a later date. In addition, we are hereby notifying potential applicants for artificial reef permits that the procedures contained in Part 323 relating to the discharge of dredged or fill materials and those in Part 324 relating to the transportation of dredged material for the purpose of dumping in ocean waters will be used in the processing of artificial reef permits when applicable.

6. *Proposed Regulations (Portion of Part 323 and All of Part 326.* On March 20, 1986, we published (51 FR 9691) a proposed change to 33 CFR 323.2(d), previously 323.2(j), to reflect the Army's policy regarding *de minimis* or incidental soil movements occurring

them apart in a separate and distinct Part 328 of the regulation.

The format for Part 328 has been changed slightly from the proposed regulation in order to improve clarity and reduce duplication. The content of the proposed § 328.2 "General Definitions" has been partially combined with § 328.3 "Definitions." The remainder has been reestablished as § 328.5, "Changes in Limits of Waters of the United States." Section 328.2 has been established as "General Scope." The proposed §§ 328.4 and 328.5 have been combined into § 328.4 and renamed "Limits of Jurisdiction."

A number of commenters appeared to have misinterpreted the intent of this part. Many thought we were trying to reduce the scope of jurisdiction while others believed we were trying to expand the scope of jurisdiction. Neither is the case. The purpose was to clarify the scope of the 404 program by defining the terms in accordance with the way the program is presently being conducted.

*Section 328.3: Definitions.* This section incorporates the definitions previously found in § 323.3 (a), (c), (d), (f) and (g). Paragraphs (c), (d), (f) and (g) were incorporated without change. EPA has clarified that waters of the United States at 40 CFR 328.3(a)(3) also include the following waters:

a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

b. Which are or would be used as habitat by other migratory birds which cross state lines; or

c. Which are or would be used as habitat for endangered species; or

d. Used to irrigate crops sold in interstate commerce.

For clarification it should be noted that we generally do not consider the following waters to be "Waters of the United States." However, the Corps reserves the right on a case-by-case basis to determine that a particular waterbody within these categories of waters is a water of the United States. EPA also has the right to determine on a case-by-case basis if any of these waters are "waters of the United States."

(a) Non-tidal drainage and irrigation ditches excavated on dry land.

(b) Artificially irrigated areas which would revert to upland if the irrigation ceased.

(c) Artificial lakes or ponds created by excavating and/or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing.

(d) Artificial reflecting or swimming pools or other small ornamental bodies of water created by excavating and/or diking dry land to retain water for primarily aesthetic reasons.

(e) Waterfilled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States (see 33 CFR 328.3(a)).

The term "navigable waters of the United States" has not been added to this section since it is defined in Part 329.

A number of comments were received concerning the proposed change to the definition of the terms "adjacent" and the proposed definitions for the terms "inundation", "saturated", "prevalence", and "typically adapted." A number of commenters believed that these terms may better define the scope of jurisdiction of the section 404 program, but such definitions should more rightfully be within the province of the Environmental Protection Agency in order to remain consistent with the opinion of Benjamin Civiletti, Attorney General (September 5, 1979). These definitions would require the prior approval of the Environmental Protection Agency, which has not been forthcoming. Therefore, these new proposed definitions will not be adopted at this time.

To respond to requests for clarification, we have added a definition for "tidal waters." The definition is consistent with the way the Corps has traditionally interpreted the term.

*Section 328.4: Limits of Jurisdiction.* Section 328.4(c)(1) defines the lateral limit of jurisdiction in non-tidal waters as the ordinary high water mark, provided the jurisdiction is not extended by the presence of wetlands. Therefore, it should be concluded that in the absence of wetlands the upstream limit of Corps jurisdiction also stops when the ordinary high water mark is no longer perceptible.

*Section 328.5: Changes in Limits of Waters of the United States.* This section was changed to reflect both natural and man-made changes to the limits of waters of the United States. This change was made for clarification and resulted from consultation with the Environmental Protection Agency.

*Section 328.6: Supplemental Clarification.* Most commenters favored the Corps plans to give special consideration to unique areas such as Arctic Tundra that do not easily fit the generic" wetlands definition. Several

commenters indicated that the Corps should clarify its intended use of this section, and one questioned the need to "describe" unique areas in the **Federal Register.** A number of commenters indicated that criteria should be specified for determining wetland types to be included as unique areas. Some commenters stated that close coordination between the Corps and the Environmental Protection Agency will be necessary when selecting unique areas and developing procedures for making wetland determinations in such areas, since the Environmental Protection Agency has the final authority to determine the scope of "Waters of the United States."

While we believe that supplemental clarificaion of unique areas will be a positive step in clarifying the scope of jurisdiction under the section 404 permit program, we have determined that such supplemental clarification can be done under existing regulations of the Environmental Protection Agency and the Corps and therefore have deleted this section.

Part 329—Definition of Navigable Waters of the United States

We are currently planning to propose a complete revision of Part 329 in the near future, to simplify and clarify the procedures involved, while retaining the essential aspects of the relevant policy. In the interim, we are making the two minor changes discussed below.

*Section 329.11:* This section has been modified to clarify that the lateral extent of jurisdiction in rivers and lakes extends to the edge of all such waterbodies as it does in bays and estuaries (§ 329.12(b)).

*Section 329.12(a):* This section has been corrected to reflect that the territorial seas, for the purpose of Rivers and Harbors Act of 1899 jurisdiction, extend 3 geographic miles everywhere and are measured from the baseline.

Part 330—Nationwide Permits

We are reissuing the 26 nationwide permits at § 330.5(a) as modified and conditioned. The nationwide permits will be in effect for 5 years beginning with the effective date of this regulation, unless sooner revised or revoked.

*Section 330.1:* This section was restructured and updated in order to improve its readability and technical accuracy. The definition concerning the division engineer's discretionary authority was deleted from this section since similar language appears in § 330.2, "Definitions." The discussion concerning the applicability of nationwide permits as they relate to

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                          )

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS      ) | |
| )| |
|     Plaintiff,           ) | |
| ) | |
|         v.           ) | Civ. No. 1:07-cv-00972 (RMU) |
| ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al.      ) | |
| ) | |
|     Defendants.      ) | |

_____)

## [Proposed] ORDER

Upon consideration of Defendants' Motion for Judgment on the Pleadings, memorandum in support thereof, and all related filings, and for good cause shown, it is hereby:

**ORDERED**, that Defendants' Motion is **GRANTED**.

It is further **ORDERED** that Plaintiff's Complaint is **DISMISSED** with prejudice and judgment shall be entered in favor of Defendants.

It is so **ORDERED** this _____ day of _____, 2007.


_____
Hon. Ricardo M. Urbina
United States District Judge