# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:07-cv-00972-RMU** |
| | ) | |
| **UNITED STATES ARMY CORPS OF ENGINEERS** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **PRESTON M. GEREN, III,** | ) | |
| **In his Official Capacity as the Acting Secretary of** | ) | |
| **The United States Department Of The Army** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **LT. GEN. ROBERT L. VAN ANTWERP,** | ) | |
| **In his Official Capacity as the Chief of Engineers** | ) | |
| **For the United States Army Corps of Engineers** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN OPPOSITION TO THE UNITED STATES ARMY CORPS OF ENGINEERS' MOTION FOR JUDGMENT ON THE PLEADINGS

# Table of Contents

I.　　Introduction ................................................................................................ 1

II.　　Background.................................................................................................. 2

　　A.　　Nationwide Permits ..................................................................... 2

　　B.　　NWP 46 ......................................................................................... 5

III.　　NAHB Has Standing to Challenge NWP 46. ....................................... 7

　　A.　　The Merits of the Claim Are Not at Issue at this Stage, and NAHB's
　　　　　Standing Is Self-Evident. .............................................................. 8

　　B.　　NWP 46 Injures NAHB and its Members. ................................ 10

　　　　1.　　NAHB and its Members Were Injured Immediately upon
　　　　　　　Promulgation of the Rule. ................................................ 13

　　　　2.　　That the Corps Defers a Decision as to its Jurisdiction Until Case-
　　　　　　　by-Case Review Does Not Vitiate NAHB's Injury. ................. 14

　　　　3.　　NWP 46 Has Immediate Consequences and Causes NAHB's
　　　　　　　Members Injury, Regardless Whether they Require an
　　　　　　　Authorization under the NWP. ............................................. 18

　　C.　　NWP 46 Causes the Injury Complained of and the Court Can Redress that
　　　　　Injury. ................................................................................................ 20

　　　　1.　　*TWU* is Wholly Distinguishable Because it Involved a Case-
　　　　　　　Specific Challenge to a Change in a Regulation. ..................... 22

　　　　2.　　NAHB's Injury, Which is Caused by NWP 46, is Redressable by
　　　　　　　this Court's Review............................................................... 24

IV.　　Conclusion................................................................................................ 25

## I.    Introduction

Rather than defend its Nationwide Permit ("NWP") 46 on the merits, the U.S. Army Corps of Engineers ("Corps") has filed a motion for judgment on the pleadings ("Defendants' Motion").  The Corps argues that Plaintiff National Association of Home Builders ("NAHB") "cannot demonstrate a sufficient causal nexus between NWP 46 and any alleged injury," and thus lacks standing under Article III of the Constitution.  Defendants' Motion at 1.  This Motion is yet another tactic taken by the Corps to escape judicial review of its Nationwide Permit Rule.[1] *See* "Reissuance of Nationwide Permits; Notice," 72 Fed. Reg. 11,092 (Mar. 12, 2007) ("NWP Rule").

This suit is a challenge, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.,* and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, to NWP 46, which the Corps administers pursuant to section 404(e) of the CWA.  Section 404(e) authorizes the Corps to issue permits for activities in navigable waters.  NAHB alleges that NWP 46, which purports to regulate areas outside the navigable waters – *i.e.*, non-tidal upland ditches – violates the CWA and APA.

In its Motion, the Corps mischaracterizes NAHB's basic claim.  NAHB does not allege that NWP 46 "change[s] the jurisdictional status of ditches."  Defendants' Motion at 2.  Rather,

---

[1] In an earlier suit, NAHB brought a facial challenge to the Corps's 2002 NWP Rule.  67 Fed. Reg. 2020 (Jan. 15, 2002).  Before the district court, the Corps, seeking to avoid review on the merits, claimed that the NWPs were not final agency action.  The district court agreed, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 297 F. Supp. 2d 74 (D.D.C. 2003), and NAHB appealed the decision.  Before the Court of Appeals, the Corps switched course and conceded that the NWPs were final agency action, but then argued that the NWPs were not ripe for review.  The Court of Appeals reversed the district court and held that both arguments failed.  It concluded that NWPs are "final agency action" subject to judicial review under the APA and ripe for review.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272 (D.C. Cir. 2005).  Failing to win on those jurisdictional arguments, the Corps now challenges NAHB's standing.

NAHB's complaint is that NWP 46 implements the Corps's unlawful view that it has jurisdiction over non-tidal upland ditches. By issuing NWP 46, the Corps announces to the public that it has authority to regulate non-tidal, upland ditches. These areas are outside the Corps's jurisdiction, and therefore it is unlawful for the Corps to attempt to regulate them.

Contrary to the Corps's claim, the fact that NWP 46 may defer any determination regarding the jurisdictional status of any particular ditch to a later time does not defeat NAHB's standing to bring a facial challenge to NWP 46 now. The practical effect of converting NAHB's facial challenge into an "as-applied" challenge (by requiring "case-by-case" review of NWP 46) would be to allow the NWP to evade judicial review.

NWP 46 has an immediate impact, which causes injury to NAHB and its members, and that injury may be redressed by this Court's review of the Corps's action. Thus, NAHB has standing to bring this challenge, and the Corps's Motion should be denied.

## II.    Background

### A.    Nationwide Permits

Section 301(a) of the CWA prohibits the discharge of pollutants, such as dredged or fill material, into regulated waters, 33 U.S.C. § 1311(a), except in compliance with a permit issued under CWA sections 402 or 404. Under section 404, the Corps is authorized to issue both individual permits ("IPs") (authorized under section 404(a)) and NWPs (authorized under section 404(e)). 33 U.S.C. § 1344. In 1977, Congress amended the CWA to authorize the Corps, after notice and an opportunity for a hearing, to issue "general permits" on a state, regional, or nationwide basis for categories of activities that the Corps determines are similar in nature and have only minimal adverse effects when performed separately and cumulatively. *Id.* § 1344(e)(1). The amendment authorized permits to be issued for five-year terms, and, in section 404(e)(2), provided that permits "may be revoked or modified by the Secretary if, after

opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits." 33 U.S.C. § 1344(e)(2).

As the Corps explained when it promulgated the 1977 NWPs, a "general permit is issued following an evaluation of the proposed category of discharges in accordance with procedures of this regulation . . . and a determination that the proposed discharges will be in the public interest . . . ." 42 Fed. Reg. 36,989, 37,145 (July 19, 1977). Before it issues an NWP, the Corps must comply with the requirements of the National Environmental Policy Act by preparing an environmental assessment for each NWP. 72 Fed. Reg. at 11,095. Each NWP must also comply with the 404(b)(1) Guidelines, which govern the issuance of general permits under section 404. 40 C.F.R. § 230.7. A decision document is issued for each NWP and contains the agency's 404(b)(1) analysis, including a "written evaluation of the potential individual and cumulative impacts of the categories of activities to be regulated under the general permit." 40 C.F.R. § 230.7(b). In deciding whether to issue an NWP, the Corps relies on "available national data on the status of wetlands and other aquatic habitats in the United States, and the potential impacts of the NWPs on those waters." 72 Fed. Reg. at 11,094-95. Finally, the Corps must determine whether the NWP complies with other Federal laws, including the Endangered Species Act, the National Historic Preservation Act, and Magnuson-Stevens Fishery Management and Conservation Act. 72 Fed. Reg. at 11,192, 11,195. In sum, an NWP can only issue after a lengthy review process, which is designed by statute to ensure that only those general permits that authorize minimal adverse cumulative effects are permitted to go forward without the project-specific evidence required for an IP.

NWPs allow the Corps to process small discharges promptly and give more individualized attention to projects with greater impacts to important aquatic resources. In fact, a key rationale for authorizing this program was the Corps's workload and the burdens the permitting program had imposed on the general public.[2] Since 1977, the Corps has issued and reissued a series of NWPs approximately every five years. NWPs are issued through a notice and comment rulemaking process and take effect immediately upon publication in the Federal Register. Unlike the issuance of IPs, people do not "apply" for NWPs, and the Corps does not "issue" them to any specific person. Once the NWPs are published, if a project meets the terms of the NWP, the project proponent may proceed. Hence, an NWP "is automatic, which means that if one qualifies for such a permit no application is needed nor must notice be given before beginning the discharge activity." *Riverside Irrigation Dist. v. Stipo*, 658 F.2d 762, 764 (10th Cir. 1981).[3] Approximately 35,000 projects a year are authorized through NWPs.[4]

IPs, on the other hand, are "a longer, more comprehensive procedure." *New Hanover Twp. v. U.S. Army Corps of Eng'rs*, 992 F.2d 470, 471 (3d Cir. 1993). IPs are issued to "applicants" after a "case-by-case evaluation of a specific project involving the proposed discharge. . . ." 33 C.F.R. §323.2(g); 33 U.S.C. §1344(a). The IP process involves a "public interest" review, opportunity for public notice and comment (including, in some circumstances, a

---

[2] *See* 123 Cong. Rec. 10,431 (Apr. 5, 1977) (statement of Rep. Wright), *reprinted in* 4 Sen. Comm. on Env't and Pub. Works, 95th Cong., 2d Sess., *A Legislative History of the Clean Water Act of 1977*, at 1356 (Comm. Print. 1978) (charging that "the all-inclusive authority of the Army Corps of Engineers . . . would be requiring citizens in great numbers to go to the Army to apply for permits and then to wait 6 or 8 or 10 weeks for permission to use their own land . . .").

[3] NWP 46 requires filing of pre-construction notification ("PCN") with the Corps before an activity under the NWP may begin.

[4] In FY 2003, the Corps authorized 35,317 projects with NWPs and 43,486 with regional general permits. *See* U.S. Army Corps of Engineers, "All Permit Decisions FY 2003" *available at* http://www.usace.army.mil/inet/functions/cw/cecwo/reg/2003webcharts.pdf (last visited Sep. 27, 2007).

hearing), and a requirement that applicants avoid, minimize, and mitigate wetlands impacts.  *See generally* 33 C.F.R. pt. 325; 40 C.F.R. pt. 230.  The burden is on the applicant to demonstrate that its project is the least environmentally damaging practicable alternative.  Thus, the IP process involves a fact-specific determination based on the merits of the individual project.  A party that discharges, without meeting the conditions of a general permit or obtaining an IP, faces both civil and criminal enforcement actions.  *See* 33 U.S.C. § 1319; 33 C.F.R. § 326.5-.6.

On March 12, 2007, the Corps issued or reissued a set of NWPs, general conditions, and definitions.  72 Fed. Reg. 11,092.  Each NWP authorizes a certain category of activities (for example, NWP 21 authorizes certain mining activities and NWP 3 authorizes certain maintenance activities), and contains restrictions on its use intended to ensure that the adverse environmental effects of the permit are minimal.  One of the new permits is NWP 46, the focus of this action.

**B.    NWP 46**

Ditches are everywhere and commonplace throughout the American landscape.  Many roads have ditches on both sides, and some even have additional ditches in the median strip.  With more than 3.9 million miles of roads in this country, this adds up to a lot of ditches.[5]  NWP 46 authorizes discharges of dredged or fill material into non-tidal ditches that are:  "(1) constructed in uplands, (2) receive water from an area determined to be a water of the United States prior to the construction of the ditch, (3) divert water to an area determined to be a water of the United States prior to the construction of the ditch, and (4) are determined to be waters of the United States."  72 Fed. Reg. at 11,190.  Under NWP 46, the discharge must not cause the

---

[5]  *See* U.S. Dep't of Transp., Federal Highway Admin., Highway Statistics 2001 § V, Roadway Extent, Characteristics and Performance, Table HM-10, *available at* http://www.fhwa.dot.gov/ohim/hs01/hm10.htm (last visited Sep. 27, 2007).

loss of greater than one acre of the waters of the United States.  *Id.*  For discharges that cause the loss of non-tidal upland ditches exceeding one acre, NWP 46 is not available; the prospective permittee would either need to revise its project to meet the terms of NWP 46 or seek authorization from the Corps under an IP.

Pre-construction notification ("PCN") is required for all activities that might qualify for NWP 46.  To comply with General Condition 27, which contains the Corps's requirements for PCN, a prospective permittee must provide the district engineer with:  (1) the name, address, and telephone numbers of the prospective permittee; (2) the location of the proposed project; (3) a description of the proposed project, the project's purpose, direct and indirect adverse environmental effects caused by the project, and any other NWP(s), regional general permit(s), or IP(s) used or intended to be used to authorize any part of the proposed project or any related activity; (4) a delineation of special aquatic sites and other waters of the United States on the project site, prepared in accordance with the current method required by the Corps; (5) if the proposed activity will result in the loss of greater than $1/10$ acre of wetlands, a statement describing how the mitigation requirement will be satisfied; (6) if any listed, endangered, or threatened species or designated critical habitat might be affected or is in the vicinity of the project, the name(s) of those species that might be affected or the critical habitat that may be affected; and (7) for an activity that may affect an historic property, identification of historic property that may be affected by the proposed work or a vicinity map indicating the location of the historic property.  72 Fed. Reg. at 11,194-95.

Further, "the description [of the proposed project] should be sufficiently detailed to allow the district engineer to determine that the adverse effects of the project will be minimal and to determine the need for compensatory mitigation."  *Id.*  The PCN should include sketches when

necessary to show that the activity complies with the terms of the NWP. 72 Fed. Reg. at 11,195. In reviewing the PCN, the district engineer has 45 calendar days from receipt of a complete PCN to determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects, or may be contrary to the public interest. *Id.* The district engineer will then provide a written response to the applicant stating that the project may proceed under the terms and conditions of the NWP. *Id.*

Under the terms of NWP 46, the Corps purports to have CWA section 404 regulatory and permitting authority over non-tidal upland ditches. Though the Rule states "the Corps reserves the right on a case-by-case basis to determine whether non-tidal ditches excavated on dry land . . . constitute waters of the United States," 72 Fed. Reg. at 11,143, by obligating a prospective permittee to submit a PCN for an activity that may not ultimately require a CWA section 404 permit, the Corps is exercising authority outside of its statutory jurisdiction. The PCN requirement, in and of itself, requires a prospective permittee to subject its project to the Corps's regulatory authority, regardless whether it might ultimately be necessary. Unto itself, the elaborate PCN process is burdensome, costly, and time intensive. Accordingly, in promulgating NWP 46, the Corps has issued a permit for activities and areas over which it has no authority. This is the crux of NAHB's complaint.

## III.    NAHB Has Standing to Challenge NWP 46.

To establish standing, a party must show: (1) an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent, (2) caused by or fairly traceable to the challenged act, and (3) redressable by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Organizations can have standing in two ways. The first is in a representational capacity on behalf of its members. An organization seeking to vindicate its members' interests must show: (1) the conduct challenged is injurious to its members, "who would otherwise have standing to

sue in their own right"; (2) the interests the organization seeks to protect are germane to its purposes; and (3) the nature of the claim or the relief sought does not necessitate the participation of an injured member for proper resolution of the suit. *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333 (1977). Second, an organization can have standing to sue in its own right, where "a concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372 (1982) (citing *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972)).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975). NAHB's complaint, particularly ¶¶ 4-5, more than sufficiently alleges both representational and first-party organizational standing.

### A. The Merits of the Claim Are Not at Issue at this Stage, and NAHB's Standing Is Self-Evident.

A court's threshold inquiry into standing "in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal." *Warth,* 422 U.S. at 500. Thus, despite the Corps's attempt to have this Court adjudicate the merits of the case by determining whether NWP 46 alters the Corps's jurisdiction, the Court should put aside any judgment as to whether NAHB's challenge will be sustained and solely consider whether there is a case or controversy. *See* Defendants' Motion at 7 ("NWP 46 expressly defers any determination whether a particular ditch is a 'water of the United States' within the Corps' regulatory jurisdiction."); Defendants' Motion at 2 ("NWP 46 does not purport to exercise jurisdiction over any ditches; by its plain terms, it defers any determination of the jurisdictional status of

potentially covered ditches to a case-by-case determination. . .   Because NWP 46 does not change the jurisdictional status of any ditches, NWP 46 cannot have caused NAHB any injury.").

At the motion to dismiss stage, NAHB need not do more than assert "general factual allegations of injury." *Fund for Animals v. Norton*, 322 F.3d 728, 733 n.4 (D.C. Cir. 2003). *See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)).   Indeed, it is not until the summary judgment stage that a party has the obligation to set forth, by affidavit or other evidence, specific facts.   *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). *Sierra Club* also makes clear that parties are not required to file evidentiary submissions in support of standing in every case.   To the contrary:

> In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it.   In particular, if the complainant is "an object of the action (or forgone action) at issue" - as is the case usually in review of a rulemaking . . . - there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."

*Id.* at 899-900 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 561-62).   For the purpose of determining whether standing is self-evident, the Court of Appeals has noted that "we see no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property." *Fund for Animals*, 322 F.3d at 734.

In *Nat'l Ass'n of Home Builders*, NAHB challenged the Corps's 2002 NWP Rule, 67 Fed. Reg. 2020 (Jan. 15, 2002), under the APA and the CWA as being "arbitrary, capricious, and contrary to the law."   417 F.3d at 1283.   The Court of Appeals held that it was "fairly 'self-

evident' that the various appellants as representatives of the regulated parties satisfy the 'irreducible constitutional minimum' of Article III standing, *Lujan*, 504 U.S. at 560, (injury-in-fact, causation, redressability) and the additional requirements for representational standing. . . ." 417 F.3d at 1286-87; *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 2007 U.S. Dist. LEXIS 6366, at *8 n.2 (D.D.C. Jan. 30, 2007) (in challenge to a Corps regulation, intervenor defendant's argument that NAHB lacked standing was rejected by the court, which noted that NAHB "alleged a concrete and particularized injury that is actual, traceable to enforcement of the . . . rule, and redressable by the court"). As in NAHB's earlier challenge to the Corps's 2002 NWP Rule, NAHB meets the standing requirements here because its members are the objects of NWP 46. Further, if the Court grants the relief requested in NAHB's complaint, its injury would be redressed. *See* Compl. ¶ 6.

At the summary judgment phase, if standing is not self-evident, NAHB will be prepared to produce evidence by declaration setting forth specific facts of its and its members' "'special interest' in the subject" of NWP 46. *Lujan,* 504 U.S. at 563 (quoting *Washington State Apple Adver. Comm'n*, 432 U.S. at 343). But, at this juncture, NAHB's complaint is more than sufficient to survive the Corps's Motion and establish standing.

### B. NWP 46 Injures NAHB and its Members.

Although the Corps's Motion is primarily focused on causation, it "note[s]" that NAHB has not alleged the requisite injury-in-fact but then "assum[es]" *arguendo* that it has. Defendants' Motion at 10. But, as the Supreme Court has held, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing. . . .'" *Warth*, 422 U.S. at 500 (internal citations omitted). NWP 46 creates legal rights and imposes binding obligations by authorizing certain discharges of dredged and fill material into non-tidal upland ditches under CWA section 404(e) without any detailed

project-specific review.[6]  *See Nat'l Ass'n of Home Builders*, 417 F.3d at 1279-80 ("The Corps' NWPs create legal rights and impose binding obligations insofar as they authorize certain discharges of dredged and fill material into navigable waters without any detailed, project-specific review by the Corps' engineers.").  Moreover, NAHB's members *are regulated* by NWP 46.  Their land-use activities must adhere to Corps requirements.

Contrary to the Corps's characterization of NWP 46, it does more than merely "provide that those wishing to discharge into certain ditches that are determined to be jurisdictional waters of the United States may do so without obtaining an individual permit."  Defendants' Motion at 2.  The CWA only gives the Corps authority to issue permits for discharges into "the navigable waters," but through *this* NWP, the Corps purports to exercise authority over non-tidal upland ditches as covered by the term "the navigable waters."  NAHB's complaint is that the Corps lacks *any* permitting authority over *any* non-tidal upland ditch as statutory "navigable waters."[7] Therefore, NWP 46 should be "h[e]ld unlawful and set aside because it is . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(c).

---

[6] The Corps asserts that "NAHB's Complaint fails to identify anything in the Corps' preamble or the terms of NWP 46, itself, that addresses the jurisdictional status of ditches." Defendants' Motion at 6-7.  This is disingenuous.  The Corps's issuance of a permit to regulate non-tidal upland ditches creates the impression that the Corps has regulatory authority over non-tidal upland ditches.  Thus, the regulated community will take the rule for what it appears to be – a statement of jurisdiction.

[7] At the appropriate time, NAHB will argue that, as a matter of law, Congress intended non-tidal upland ditches to be regulated as "point sources" and not "navigable waters," based on key CWA definitions.  *See* 33 U.S.C. §§ 1362(12) ("discharge"); *id.* § 1362(14) ("point source"). Recent Supreme Court case law supports NAHB's view.  *See Rapanos v. United States,* 126 S. Ct. 2208, 2223 (2006) (plurality); *id.* at 2243 (Kennedy, J., concurring in judgment).  At this nascent point in the suit, additional argument on the underlying nature of NAHB's claims is inappropriate because an inquiry into standing is not a review of the merits.  *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs,* 142 F.3d 468, 473 (D.C. Cir. 1998); *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997) ("Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits.  Otherwise, every unsuccessful plaintiff will have lacked standing in the first place.").

In *Lujan*, the Court held:

> When the suit is one challenging the legality of government action
> . . . the nature and extent of facts that must be averred . . . depends
> considerably upon whether the plaintiff is an object of the action . .
> . at issue.  If he is, there is ordinarily little question that the action .
> . . has caused him injury, and that a judgment preventing . . . the
> action will redress it.

*Lujan,* 504 U.S. at 561-62.  There should be "little question" that this rule injures NAHB's

members.  NWPs cause an immediate injury to would-be discharges:

> But the NWPs do not simply work a change in the Corps'
> permitting procedures, thereby disadvantaging some within the
> class of would-be dischargers.  The NWPs are not a definitive, but
> otherwise idle, statement of agency policy - they carry easily-
> identifiable legal consequences for . . . would-be dischargers.

*Nat'l Ass'n of Home* Builders, 417 F.3d at 1279.  NWP 46, which purports to regulate upland

ditches, has immediate and identifiable legal consequences for NAHB's members, who are

objects of the rule.  *See* Compl. ¶ 5 ("The activities of NAHB's members are subject to

regulation" by NWP 46.).  "Members of NAHB have in the past and will in the future rely on the

NWP Rule, specifically NWP 46.  Ditches are common features in the American landscape, and

NAHB's members must often dig, construct, and alter upland ditches as necessary and

appurtenant to residential construction projects."  *Id.*  Further, as an organization, NAHB has

been directed by its members to advocate for the appropriate regulation of non-tidal upland

ditches.  *See* Compl. ¶ 4(b).

NWP 46 is the agency's expression of jurisdiction over non-tidal upland ditches, which

fall outside its statutory authority under the CWA.  The Corps's action thus injures NAHB and

its members.  Therefore, NAHB must have standing to ensure that the Rule does not outrun the

Corps's statutory authority.  *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d

1399 at 1405, 1407-08 (D.C. Cir. 1998) (in facial challenge to the definition of "discharge of

dredged material," rule was overturned by the court for "outrun[ning] the Corps's statutory authority").

### 1. NAHB and its Members Were Injured Immediately upon Promulgation of the Rule.

The Corps argues that:

> [T]he Corps' issuance of NWP 46 did not change the jurisdictional status of ditches. As a result of NWP 46, whether a ditch is a jurisdictional water of the United States will continue to be determined on a case-by-case basis, just as it was prior to issuance of NWP 46, and just as it would continue to be in the absence of NWP 46. Because issuance of NWP 46 does not change the status quo pertaining to the jurisdictional status of ditches, issuance of NWP could not have caused NAHB or its members any injury.

Defendants' Motion at 13. This argument misapprehends NAHB's suit, which is a facial challenge to NWP 46. Judicial review of facial challenges is common and necessary to ensure that an agency enacts regulations that are consistent with its statutory authority.[8] In *Nat'l Mining*, the Court of Appeals observed that it has "on several occasions invalidated agency regulations challenged as facially inconsistent with governing statutes." 145 F.3d at 1405, 1407-08.

---

[8] *See, e.g., EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 72 n.12 (1980) (facial challenge to the variance provision of an EPA pollution-control regulation was ripe even "prior to application of the regulation to a particular [company's] request for a variance"); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 200-02 (1983) (challenge to state law imposing a moratorium on the certification of nuclear power plants proper though utilities had not yet applied for a certificate); *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 855 (D.C. Cir. 2002) (district court had jurisdiction over facial challenges to regulations); *Nat'l Mining Ass'n v. Dep't of Interior*, 177 F.3d 1, 3-4 (D.C. Cir. 1999) (reviewing facial challenge to regulations implementing mining permit program); *George E. Warren Corp. v. EPA*, 159 F.3d 616 (D.C. Cir. 1998) (regulations implementing reformulated gasoline program reviewed on their face); *Nat'l Recycling Coal., Inc. v. Browner*, 984 F.2d 1243, 1249 (D.C. Cir. 1993) (facial challenge to regulations regarding recycled products purchase program); *NRDC v. EPA*, 966 F.2d 1292 (9th Cir. 1992) (facial challenge to stormwater permit regulations).

Other courts have heard facial challenges to NWPs. *See, e.g., Alaska Ctr. for the Env't v. West*, 157 F.3d 680 (9th Cir. 1998) (facial challenge to five general permits governing construction in Alaska wetlands); *Alaska Ctr. for the Env't v. West*, 31 F. Supp. 2d 714, 720 n.6 (D. Alaska 1998) (facial challenge to NWP 29); *Ohio Valley Envtl. Coal. v. Bulen*, 410 F. Supp. 2d 450 (S.D. W.Va. 2004) (facial challenge to NWP 21), *vacated in part on other grounds*, 429 F.3d 493 (4th Cir. 2005). NAHB seeks the same type of judicial review. If this case is not heard now, and, indeed, the Corps has acted outside the scope of its authority under the CWA in issuing NWP 46, an unlawful rule will evade review.

### 2. That the Corps Defers a Decision as to its Jurisdiction Until Case-by-Case Review Does Not Vitiate NAHB's Injury.

The Corps would have this Court believe that NAHB lacks standing because its members cannot be injured until a decision as to jurisdiction is reached in a particular case. *See, e.g.,* Defendants' Motion at 2 ("[NWP 46] defers any determination of the jurisdictional status of potentially covered ditches to a case-by-case determination . . . Because NWP 46 does not change the jurisdictional status of any ditches, NWP 46 cannot have caused NAHB any injury."). This argument, although advanced in the context of a standing defense, is analogous to a ripeness claim, as it essentially asserts that NAHB's challenge is not fit for review until some later time. Indeed, the Supreme Court has noted that "[t]he standing question . . . bears close affinity to questions of ripeness – whether the harm asserted has matured sufficiently to warrant judicial intervention . . . ." *Warth*, 422 U.S. at 499 n.10. In analyzing ripeness, a court determines whether the issues are "fit[] . . . for judicial decision," and whether withholding consideration of their claims at this time would work "hardship to the parties." *Ohio Forestry Ass'n*, 523 U.S. at 733 (quoting *Abbott Laboratories*, 387 U.S. 136, 149 (1967)).

14

The Court of Appeals has already debunked the Corps's theory that "NWPs are not fit for review because their applicability to a given activity remains within the Corps' discretion." *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282. Nor does the issue-now/decide-later structure of NWP 46 warrant denying review. "[T]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). Thus, irrespective of whether the Corps chooses to defer a decision on a particular application for NWP 46, NAHB has a demonstrable injury now and the challenge is appropriate for review.

The Corps's arguments here are reminiscent of the defenses it raised in NAHB's challenge to the "Tulloch II" rule. There, the Corps adopted a rule that was clearly intended to regulate all earth-moving activity. The rule said, however, that the Corps "regards" earth-moving as regulable "unless project-specific evidence shows otherwise" and stated explicitly that the "regards" language "is not intended to shift any burden." 66 Fed. Reg. 4550, 4575 (Jan. 17, 2001). The Corps claimed that NAHB's challenge was not fit for review because the ultimate determination whether a particular project required a permit would be made case-by-case, based on project-specific evidence. But the Court of Appeals was not persuaded: "While the final determination of whether to require a permit in a given case will, as is usual in an agency adjudication rest on case-specific findings, this fact does not diminish the fitness of 'Tulloch II' for review" because the court's review is not dependent on "how the [agency] might exercise its discretion in the future." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464-65 (D.C. Cir. 2006).

The same is true here. The Corps's claim that NWP 46 does not exercise jurisdiction, like its claim that the "regards" language did not shift any burden, is just another "coy

explanation." *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 2007 U.S. Dist. LEXIS 6366, at *13-14 (D.D.C. Jan. 30, 2007) ("That statement, followed by the coy explanation that it 'is not intended to shift any burden,' . . . , essentially reflects a degree of official recalcitrance that is unworthy of the Corps."). The Corps has issued an NWP to regulate construction activity in ditches. NAHB's members will design their projects to come within the permit. That the Corps may ultimately decide they never needed a permit to begin with does not justify the unlawful assertion of authority in the first place. The time and money spent by the applicant to submit the PCN will have been for naught.

Like NAHB's challenge to the Tulloch II rule, NAHB has brought this lawsuit for judicial review of the agency's promulgation of NWP 46 to determine whether it is a "faithful application" of the CWA. Nothing in that inquiry requires case-specific facts. A facial legal challenge by its very nature is reviewable without development of as-applied facts. And, as with most challenges to agency action under the APA, review will be on the record, so case-specific facts will not aid the Court.[9] *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Thus, the Corps's argument that jurisdiction under NWP 46 has not yet been determined until a particular permittee applies for an NWP rings hollow.

Facts pertaining to a specific granting or denial of a permit under NWP 46 will not alter NAHB's standing. Indeed, requiring an as-applied injury in the context of a facial challenge to a legislative rulemaking would vitiate the APA's promise that "a person suffering legal wrong because of agency action is entitled to judicial review." 5 U.S.C. §702. NAHB's challenge is

---

[9] Like NAHB's challenge to the 2002 NWPs, "[n]o further factual development is necessary to evaluate the . . . challenge. All of the facts necessary for judicial review were before the Corps when it issued the permits and, on APA review, its action necessarily stands or falls on that administrative record and its statutory permitting authority under the CWA." 417 F.3d at 1282.

not to the Corps's application of NWP 46; rather, it asserts that NWP 46, on its face, is illegal because it exceeds the Corps's authority under the CWA.[10]  As the Supreme Court recognized in *Columbia Broad. Sys., Inc. v. United States*, pre-announced conditions for receiving a permit or license – such as NWP 46's one-acre ceiling – have the "force of law" even before the individual permitting or licensing proceeding begins.  316 U.S. 407, 418-19 (1942).  Observing "that men conform their conduct to regulations by governmental authority so as to avoid the unpleasant legal consequences which failure to conform entails," the Court concluded that "the expected conformity to [the permitting requirements] causes injury cognizable by a court of equity."  *Id.; see also Frozen Food Express v. United States*, 351 U.S. 40, 44-45 (1956) (a facial challenge to the Interstate Commerce Commission's order was not "abstract, theoretical, or academic" and raised justiciable issues).  In neither *CBS* nor *Frozen Food Express* were the plaintiffs forced to apply for a permit, and have it further conditioned or denied, before challenging the offending threshold restriction in court.  Likewise, NAHB's members deserve review of NWP 46 now before they are caused further injury due to forced conformity with NWP 46's illegal permitting terms.

Moreover, deferring a challenge to NWP 46 until a permittee attempts to use it would make it impossible to obtain meaningful review of the legality of the terms and conditions of the NWPs.  Congress did not give the Corps *carte blanche* to issue NWPs (or not), attach whatever conditions strike their fancy, and make such decisions unreviewable.  NAHB's challenge raises issues that are fundamentally different from issues that would arise in the context of a project-

---

[10] Where the issues presented for review are those of statutory interpretation, the Supreme Court has held that judicial review would not benefit from further factual development of the issues presented.  *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 479 (2001).

specific application of NWP 46 or a determination that a particular project is eligible (or not) for NWP 46.

### 3.    NWP 46 Has Immediate Consequences and Causes NAHB's Members Injury, Regardless Whether they Require an Authorization under the NWP.

NWP 46 is immediately effective.  The Corps tries to shield itself from review through clever wordsmithing, arguing that because NWP 46 will only authorize discharges for those ditches that are "determined to be waters of the United States," Defendants' Motion at 7 (quoting 72 Fed. Reg. at 11,190), there is no injury to NAHB, as "NWP 46 expressly defers any determination whether a particular ditch is a 'water of the United States' within the Corps' regulatory jurisdiction." Defendants' Motion at 7.  This is not the case.  Because of its practical and legal effects, NWP 46 must be "taken by those entitled to rely upon [it] as what [it] purport[s] to be . . . controlling alike upon the [agency] and all others whose rights may be affected by the [agency's] execution of them." *Columbia Broad. Sys.*, 316 U.S. 407 at 422.

A permittee seeking authorization for a project that complies with NWP 46 must submit to the rigorous PCN requirements regardless whether its activities ultimately are authorized by NWP 46 or not.  Thus, there are "'direct and immediate' consequence[s] of these authorizations for the [permittees'] 'day-to-day business.'" *Nat'l Ass'n of Home Builders*, 417 F.3d at 1280. The Corps says that the PCN requirement is to "ensure that this NWP is used only to authorize discharges into those types of ditches [that meet the specified criteria], and to ensure that those activities result in minimal adverse effects on the aquatic environment."  Defendants' Motion at 5 (quoting 72 Fed. Reg. at 11,142).  But because NWP 46 does not provide the slightest indication of which non-tidal uplands ditches are jurisdictional and which are not, many permittees will effectively be forced to submit a PCN rather than assume their activities do not require a permit and risk the serious penalties associated with a violation of the CWA.

In order to meet the PCN requirement, an applicant must provide the Corps with a delineation of the "waters of the United States" present on the applicant's property. This necessarily throws the applicant into the Corps's regulatory lair regardless whether it ultimately needs an NWP or not. As in *Abbott Labs.*, NWP 46 "purport[s] to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business" of NAHB's members. 387 U.S. at 152. *See also Nat'l Ass'n of Home Builders*, 417 F.3d at 1280 ("We would be hard pressed, and in fact decline, to conclude that the NWPs do not 'impose[] an obligation, deny[y] a right or fix [] some legal relationship.'") (quoting *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731). "The NWPs authorize certain discharges of dredged and fill material and in so doing 'grant rights, impose obligations, [and] produce other significant effects on private interests.'" *Nat'l Ass'n of Home Builders,* 417 F.3d at 1285 (quoting *Batterton v. Marshall*, 648 F.2d 694, 701-02). It should be clear that a rule with these effects injures NAHB and its members, who regularly use NWPs.

If review is not had now, NAHB's members will be forced to litigate the legal deficiencies in the Rule as defenses in an enforcement action. But deferring review is unrealistic, inappropriate, and raises due process concerns recognized by the Supreme Court. The U.S. Court of Appeals for the Tenth Circuit, in allowing a challenge to an NWP, held that it is completely "unrealistic" to require a party to "proceed with construction and test the validity of the [District] Engineer's position by incurring civil and criminal penalties."[11] *Stipo*, 658 F.2d at 767. The Supreme Court has made clear that requiring the regulated community to challenge a possibly void regulation in the posture of defense to an enforcement action risks harming the

---

[11] *See also Nat'l Ass'n of Home Builders*, 440 F.3d at 465 ("Each such dredger therefore faces the choice of applying for a permit for activities Industry claims are outside the scope of the Corps' and EPA's authority under section 404 or face civil or criminal enforcement penalties for failing to do so, *see* 33 U.S.C. § 1319(b), (c), (d).").

regulated community "severely and unnecessarily." *Abbott Labs.*, 387 U.S. at 152-53. This is especially true where, as is the case here, the party forced to defy the regulation "would risk serious criminal and civil penalties." *Id.* at 153; *see also General Electric Co. v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004) (permitting challenge where plaintiffs faced the "Hobson's choice" of "[e]ither do nothing and risk severe punishment without meaningful recourse or comply and wait indefinitely before having any opportunity to be heard").

### C.    NWP 46 Causes the Injury Complained of and the Court Can Redress that Injury.

The Corps's primary argument is that NAHB cannot satisfy the causation element of the standing test. *See* Defendants' Motion at 9 ("This case turns on the second element in the standing inquiry – causation"); *id.* at 10 ("Even assuming . . . that NAHB alleged the requisite injury-in-fact, NAHB's claims still would be subject to dismissal because it cannot establish the requisite causal 'link between the injury and the conduct complained of.'"). Causation examines whether there is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). In *Warth v. Seldin*, the Court denied standing where low-income persons sought the invalidation of a town's restrictive zoning ordinance because they failed to show that the alleged injury, inability to obtain adequate housing within their means, was fairly attributable to the challenged ordinance instead of other factors. 422 U.S. at 507. The Court noted that plaintiffs in *Warth* relied "on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." *Id. See also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976) (no standing where "speculative inferences" were necessary to connect the

respondents' injury to the challenged actions of the petitioners and there was no substantial likelihood that victory in the suit would result in respondents' sought relief).

That is not the case here. Like the Natural Resources Defense Council's challenge to EPA's rule regarding a phase-out for methyl bromide, NAHB's asserted injury is linked to the Corps's action "through a fairly straightforward chain." *Natural Res. Def. Council v. EPA*, 464 F.3d 1, 16 (D.C. Cir. 2006) ("*NRDC*"). In *NRDC*, the asserted injury was that EPA permitted too much new production and consumption of methyl bromide, which would result in more emissions, thus increasing ozone depletion, and ultimately adversely affecting the health of NRDC's members. *Id.* The Court of Appeals found this injury could be redressed if EPA did not permit such excessive production and consumption of methyl bromide. *Id.* Thus, the injury was directly traceable to EPA's decision.

If that chain passed muster in *NRDC*, the much more direct causal linkage between NAHB's injury and the Corps's action -- assertion of jurisdiction over ditches that fall outside its legal authority under the CWA -- must confer standing on NAHB. Issuance of NWP 46 drives NAHB members, whose projects are affected by upland ditches, into the PCN process even though many of them have projects that are totally outside of the Corps's jurisdiction. Feigning ignorance of NWP 46's true impact, the Corps claims that NWP 46 does not "require a permit or otherwise exercise regulatory jurisdiction over any ditches." Defendants' Motion at 10. But NAHB is injured by the Corps's promulgation of this rule, which represents the agency's view of its jurisdiction. And, an applicant is ensnared by the Corps's regulatory web long before a determination is made as to whether NWP 46 truly applies. Thus, while it is true to say that ditches are subject to the Corps' regulatory jurisdiction only if they meet the regulatory definition of waters of the United States, under the scheme established by NWP 46, an applicant

21

must subject itself to federal regulatory and permitting authority well before the Corps has determined whether any particular ditch meets its elusive jurisdictional criteria. Accordingly, NAHB's injury is caused by the Corps's promulgation of NWP 46 and could be redressed by this Court's review and decision on whether the rule exceeds the Corps's jurisdiction.

> 1.    ***TWU* is Wholly Distinguishable Because it Involved a Case-Specific Challenge to a Change in a Regulation.**

In support of its Motion, the Corps relies almost exclusively on *Transp. Workers Union v. Transp. Sec. Admin.*, 492 F.3d 471 (D.C. Cir. 2007) ("*TWU*"). But *TWU* is wholly distinguishable from NAHB's challenge. And the Corps conveniently neglects to discuss *TWU*'s facts in any great detail.

In *TWU,* the Transportation Security Administration ("TSA") drafted post-September 11, 2001 regulations governing employees who worked in sensitive areas of airports. *Id.* at 473. Those regulations disqualify a person "convicted" of a crime from holding a sensitive position. *Id*. However, it was not until May 2003 that the TSA first provided a definition of "convicted"—in a guidance document. *Id.* at 473-74. In footnote one of the guidance, TSA explained that an employee will *not* be considered "convicted" if the person provides sufficient proof, such as a court transcript, that a court advised him that entering a plea would not be considered a "conviction." *Id*. at 474. Subsequently, in 2004, the TSA revised its guidance and removed footnote one. *Id.*

In 2005, American Airlines audited its employees' criminal history records. *Id.* It discovered that, in 1998, one of its employees, Jose Valle, pled guilty to a crime in Texas. *Id.* Because the plea was a "conviction," the airline suspended Valle, based on TSA's revised 2004 guidance, because he could not work in sensitive areas, an essential part of his job. *Id.* The Transportation Workers Union ("Union") sued the TSA, on behalf of Valle:

> but not on the *usual ground* that the 2004 Guidance's definition of "conviction" is arbitrary, contrary to statute, or in excess of TSA's statutory authority, . . . , or that the definition constitutes a "legislative rule" or "substantive rule," which would require notice and comment, rather than an "interpretive rule," which would not . . . The Union instead relies on a line of cases holding that an agency cannot significantly change its position, cannot flip-flop even between two interpretive rules, without prior notice and comment.

*Id.* at 475 (emphasis added). The Union alleged that the changes TSA made from 2003 to 2004, namely the removal of footnote one regarding the proof that would negate evidence of a "conviction," caused Valle to lose his job and that such changes cannot be made without notice and comment rulemaking. *Id.*

NAHB, on the other hand, has brought a challenge "on the usual ground," under the APA, to the Corps's rule and argues that it exceeds the agency's statutory authority. Because the Corps mischaracterizes NAHB's injury, it also necessarily fails to apprehend how its action has caused NAHB's injury. The Corps attempts to characterize NAHB's challenge as one to a change in the Corps's position. In fact, NAHB has not alleged that the Corps's change in position over time on the status of ditches as "navigable waters" has caused it procedural injury. Rather, NAHB's complaint is that the Corps has exceeded its CWA authority in issuing NWP 46—a *substantive* violation. NAHB's argument that NWP 46 outruns the CWA is far different from the alleged lack of notice-and-comment in the context of a guidance document footnote in *TWU*.

In *TWU,* the "conduct complained of" was "the procedural wrong of switching from the 2003 to 2004 Guidance without notice and comment." *Id.* at 475. The alleged injury was Valle losing his job. *Id.* Thus, unless the change from the 2003 to 2004 Guidance, without notice and comment, caused Valle's injury, the Union would not have standing. *Id.* at 475-76. The Court of Appeals concluded that Valle lacked standing because the evidence was insufficient to show

that Valle would not have been fired under the 2003 guidance and, thus, TSA's procedural "change in position" did not cause Valle to lose his job. *Id*. at 476.

Here, NAHB avers that "non-tidal ditches constructed in uplands are outside the Corps regulatory authority," and the "Corps has no CWA authority to issue permits for areas outside its jurisdictional scope." Compl. ¶¶ 25-26. Furthermore, NAHB asserts that the Corps is acting arbitrarily because it "failed to provide a reasoned basis for" asserting jurisdiction over non-tidal upland ditches. Compl. ¶ 27. The Corps argues that its "issuance of NWP 46 did not change the jurisdictional status of ditches," and that, even in the absence of NWP 46, NAHB would suffer the same injury. This may or may not be true, but it is irrelevant. NAHB is not relying on any "change in position" as the cause of its injury. This suit focuses on the plain terms of NWP 46 and thus bears no comparison to *TWU*.

### 2.    NAHB's Injury, Which is Caused by NWP 46, is Redressable by this Court's Review.

The injuries to NAHB and its members can be redressed by this Court's order declaring that the Corps has no authority to regulate or require permits for discharges of dredged or fill material into upland ditches because upland ditches are not "waters of the United States" within the meaning of the CWA. The Corps has no authority to issue permits for areas outside its jurisdictional scope. NWP 46 does exactly that. It purports to control activities and issue permits for activities that fall outside the Corps's statutory authority. NAHB's injury will be redressed by a declaration from the Court that NWP 46 violates the APA and the CWA and that the Corps has no authority to regulate or require permits for the discharge of dredged or fill material into upland ditches. An injunction barring the Corps from applying or enforcing NWP 46 will also redress NAHB's injury.

## IV.    Conclusion

NAHB's standing is self-evident.    Moreover, NAHB has alleged an injury that is immediate, caused by the Corps's action, and redressable by this Court's review.    Accordingly, the Corps's Motion for Judgment on the Pleadings should be denied.


Date:    September 28, 2007                    Respectfully submitted,


                                            /s/ Karma B. Brown
                                            HUNTON & WILLIAMS LLP
                                            Virginia S. Albrecht, D.C. Bar No. 357940
                                            Karma B. Brown, D.C. Bar No. 479774
                                            1900 K Street, N.W.
                                            Washington, D.C.  20006
                                            (202) 955-1500

                                            Counsel for Plaintiff
                                            National Association of Home Builders


Of Counsel:
Duane J. Desiderio, D.C. Bar No. 40321
Thomas J. Ward, D.C. Bar No. 453907
Amy C. Chai, N.Y. Bar No. 4029088
National Association of Home Builders
1201 15th Street, NW
Washington, DC  20005

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO.** |
| **v.** ) | **1:07-cv-00972-RMU** |
| ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS ) | |
| ) | |
| AND ) | |
| ) | |
| PRESTON M. GEREN, III, ) | |
| In his Official Capacity as the Acting Secretary of ) | |
| The United States Department Of The Army ) | |
| ) | |
| AND ) | |
| ) | |
| LT. GEN. ROBERT L. VAN ANTWERP, ) | |
| In his Official Capacity as the Chief of Engineers ) | |
| For the United States Army Corps of Engineers ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

[Proposed] Order Denying
Defendants' Motion for Judgment on the Pleadings

Upon consideration of the National Association of Home Builder's Memorandum in

Opposition to the Defendants' Motion for Judgment on the Pleadings, it is hereby:

ORDERED, that Defendants' Motion for Judgment on the Pleadings is DENIED.

Dated: _____, 2007

_____
Ricardo M. Urbina
United States District Judge